/Paterson,
 
 JuJlice.
 

 The libel in this cause was exhibited by
 
 Foost
 
 Fansen, matter of the
 
 Vrouw Christiana
 
 Magdalena, a
 
 Dutch
 
 brigantine, owned by citizens of the
 
 United Netherlands
 
 ; and its prayer is, that
 
 Edward
 
 Ballard, and all others, having claim, may be compelled to make restitution. The District Court directed restitution; the Circuit Court affirmed the decree; and the cause is now before this court for revision. The
 
 Magdalena
 
 was captured by Ballard, or by
 
 Ballard
 
 and Talbot, and brought into
 
 Charleston.
 
 The general question is, whether the decree of restitution was well awarded. In discussing the question, it will be necessary to consider the capture as made,
 

 1. By
 
 Ballard,
 

 By
 
 Ballard
 
 and
 
 Talbot.
 

 1. By
 
 Ballard.
 
 This ground not being tenable, has been almost abandoned in argument. It is, indeed, impossible to suggest any reason in favor of the capture on the part of
 
 Ballard.
 
 Who is he ? A citizen of the
 
 United States
 
 : For, although he had renounced his allegiance to Virginia, or declared an intention of expatriation, and admitting the fame to have been constitutionally done, and legally proved, yet he had not emigrated to, and become the subject or citizen of, any foreign kingdom or republic. He was domiciliated within the
 
 United
 
 States, from whence he had not removed and joined himself to any other country, settling there his fortune, and family.
 
 *153
 
 From
 
 Virginia,
 
 he passed into
 
 South
 
 Carolina, where he failed on board the armed vessel called the
 
 Ami de la Liberte.
 
 He failed from, and returned to, the
 
 United
 
 States, without so much as touching at any foreign port, during his absence. In short, it was a temporary absence, and not an entire departure from the
 
 United States,
 
 an absence with intention to return, as has been verified by his conduct and the event, and not a departure with intention to leave this country, and settle in another.
 
 Ballard
 
 was, and still is, a citizen of the
 
 United States
 
 ; unless, perchance, he should be a citizen of the world. The latter is a creature of the imagination, and far too refined for any republic of ancient or modern times. If however, he be a citizen of the world, the character bespeaks universal benevolence, and breathes peace on earth and good will to man ; it forbids roving on the ocean in quest of plunder, and implies amenability to every tribunal. But what is conclusive on this head is, that
 
 Ballard
 
 failed from this country with iniquitous purpose,
 
 cum dolo ct
 
 culpa, in the capacity of a cruizer, against friendly powers. The thing itself was a crime. Now it is an obvious principle, that an act of illegality can never be construed into an act of emigration, or expatriation. At that rate, treason and emigration, or treason and expatriation, would, in certain cases, be synonimous terms. The cause of removal must be lawful; otherwise the emigrant acts contrary to his duty, and is justly charged with a crime.’ Can that emigration be legal and justifiable, which commits or endangers the neutrality, peace, or safety of the nation of which the emigrant is a member ? As we have no statute of the
 
 United States,
 
 on the subject of emigration, I have taken up the doctrine respecting it, as it stands on the broad basis of the law of nations, and have argued accordingly. That law is in no wife applicable fo the present case : for,
 
 Ballard,
 
 at the time of his taking the command of the
 
 Ami de la Liberte,
 
 and of his capturing the
 
 Magdalena,
 
 was a citizen of the
 
 United States;
 
 he was domiciliated within the fame, and not elsewhere ; and, besides, his cause of departure, supposing it to have been a tota1 departure from and abandonment of his country, was unwarantable, as he went from the
 
 United States,
 
 in the character of an illegal cruizer. The act of the legislature of
 
 Virginia,
 
 does not apply.
 
 Ballard
 
 was a citizen of
 
 Virginia,
 
 and also of the
 
 United States.
 
 If the legislature of
 
 Virginia
 
 pass an act specifying the causes of expatriation, and prescribing the manner in which it is to be effected by the citizens of that state, what can be its operation on the citizens of the
 
 United States?
 
 If the act of
 
 Virginia
 
 affects
 
 Ballard’s
 
 citizenship, so far as respects that state, can it touch his citizenship so far as it regards the
 
 United States ?
 
 Allegiance to a particular state, is one thing;
 
 *154
 
 allegiance to the
 
 United States
 
 is another. Will it be said, that the renunciation of allegiance to the former implies or draws after it a renunciation of allegiance to the latter ? The sovereignties are different; the allegiance is different; the right too, may be different. Our situation being new, unavoidably creates new and intricate questions. We have sovereignties moving within a sovereignty. Of course there is complexity and difficulty in the system, which requires a penetrating eye fully to explore, and steady and masterly hands to keep in unifon and order. A flight collision may disturb the harmony of the parts, and endanger the machinery of the whole. A statute of the
 
 United States,
 
 relative to expatriation is much wanted; especially as the common law of
 
 England,
 
 is, by the constitution of some of the dates, expressly recognized and adopted. Besides, ascertaining by positive law the manner, in which expatriation may be elicited, would obviate doubts, render the subject notorious and easy of apprehension, and furnish the rule of civil conduct on a very interesting point.
 

 But there is another ground, which renders the capture on the part of Ballard, altogether unjustifiable. The
 
 Ami de la Liberte
 
 was built in Virginia, and is owned by citizens of that state; she was sitted but as an armed floop of war, in, and, as such, failed from, the
 
 United States,
 
 under the command, of
 
 Ballard,
 
 and cruised against, and captured vessels belonging to, the subjects of
 
 European
 
 powers, at peace with the said Hates. Such was her predicament, when she took the
 
 Magdalena.
 
 It is idle to talk of
 
 Ballard's
 
 commission ; if he had any, it was not a commission to cruise as a privateer, and if so, it was of no validity, because granted to an
 
 American
 
 citizen, by a foreign officer, within the jurisdiction of the
 
 United States.
 
 We are not, however, to presume, that the
 
 French
 
 Admiral or Consul would have issued a commission of the latter kind, because it would have been a flagrant violation of the sovereignty of the
 
 United
 
 States; and of course incompatible with his official duty. Therefore, it was not, and, indeed, could not, have been a war commission. It is not necessary, at present, to determine, whether acting under colour of such a commission would be a piratical offence ? Every illegal act, or transgression, committed on the high seas, will not amount to piracy. A capture, although hot piratical, may be illegal, and of such a nature as to induce the court to award restitution.
 

 It has been urged, in argument, that the
 
 Ami de la Liberte
 
 is the property of the
 
 French
 
 republic. The assertion is not warranted by, the evidence ; and if it was, would not, perhaps, be of any avail, so as to prevent restitution by the competent authority.The proof is clear and satisfactory, that she was an
 
 American
 
 vessel, owned by citizens of the
 
 United States,
 
 
 *155
 
 and still continues to be so. The evidence in support of her being
 
 French
 
 property is extremely weak and futile; it makes no impression, it merits no attention. But if the
 
 Ami de la Liberte
 
 be the property of the
 
 French
 
 Republic, it might admit of a doubt, whether it would be available, so as to legalise her captures and prevent restoration ; because she was, after the sale
 
 (if
 
 any took place) to the republic, and before her departure from, and while she remained in, the
 
 United States,
 
 sitted out as an armed vessel of war ; from whence in such capacity, and commanded by Ballard, an
 
 American
 
 citizen, she set fail, and made capture of vessels belonging to citizens of the
 
 United Netherlands.
 
 The
 
 United States
 
 would, perhaps, be bound, both by the law of nations and an express stipulation in their treaty with the Dutch, to restore such captured vessels, when brought within their jurisdiction, especially if they had not been proceeded upon to condemnation in the Admiralty of
 
 France.
 
 On this, however, I give no opinion. The
 
 United States
 
 are neutral in the present war ; they take no part in it; they remain common friends to all the belligerent powers, not favoring the arms of one to the detriment of the others. An exact impartiality must mark their conduct towards the parties at war; for, if they favour one to the injury of the other, it would be a departure from pacific principles, and indicative of an hostile disposition. It would be a fraudulent neutrality. To this rule there is no exception, but what arises from the obligation of antecedent treaties, which ought to be religiously observed. If, therefore, the capture
 
 of the Magdalena
 
 was effected by
 
 Ballard
 
 alone, it must be pronounced to be illegal, and of course the decree of restitution is just and proper. This leads us,
 

 II. To consider the capture as having been made by
 
 Ballard
 
 and
 
 Talbot. Talbot
 
 commanded the privateer
 
 L’Ami de la Point a Pirre.
 
 The question is,as the
 
 Magdalena
 
 struck to and was made prize of by Ballard, and as Talbot, who knew his situation, aided in his equipment, and acted in confederacy with him, afterwards had a fort of joint possession, whether
 
 Talbot
 
 can detain her as prize by virtue of his
 
 French
 
 commission ? To support the validity of
 
 Talbot’s
 
 claim it is contended, that
 
 Ballard
 
 had no commission or an inadequate one, and therefore his capture was illegal: That it was lawful for
 
 Talbot
 
 to take possession of the ship to captured, being a
 
 Dutch
 
 bottom, as the
 
 United Netherlands
 
 were at open war and enmity with the
 
 French
 
 republic, and
 
 Talbot
 
 was a naturalized
 
 French
 
 citizen, acting under a regular commission from the Governor of
 
 Guadaloupe.
 
 It has been already observed, that
 
 Ballard
 
 was a citizen of the
 
 United States; t
 
 hat the
 
 Ami de la
 
 Liberte, of which he had the command, was fitted out and armed as a vessel of war in the
 
 United
 
 States; that as such she failed from the
 
 United
 
 States, and cruised against
 
 *156
 
 nations at peace and in amity with the said states. These acts were direct and daring violations of the principles of neutrality, and highly criminal by the law of nations. In effecting this state of things, how far was
 
 Talbot
 
 instrumental and active ? What was his knowledge, his agency, his participation, his conduct in the business ? It appears in evidence, that
 
 Talbot
 
 expected
 
 Ballard
 
 at
 
 Tybee
 
 ; that he waited for him there several days; that he set sail without him, and in a short time returned to his former station. This indicates contrivance and a previous communication of designs. At length
 
 Ballard
 
 appeared. On his arrival,
 
 Talbot
 
 put on board the
 
 Ami de la Lib
 
 erte, in
 
 Savannah
 
 river, and consessedly within the jurisdiction of the
 
 United States,
 
 four cannon, which he had brought for the purpose. Were these guns furnished by order of the
 
 French
 
 Consul ? The insinuation is equally unfounded and dishonorable. They also fired a salute, and hailed Sinclair, a citizen of the
 
 United
 
 States, as an owner. An incident of this kind, at such a moment, has the effect of illumination.
 
 Talbot
 
 knew
 
 Ballard’s
 
 situation, and in particular aided in fitting out the
 
 Ami de la Liberte
 
 by furnishing her with guns. Without this assistance she would not have been in a state for war. An essential part of the outfit, therefore, was provided by
 
 Talbot.
 
 The equipment being thus completed, the two privateers Went to sea. When on the ocean, they acted in concert; they cruize together, they fought together, they captured together.
 
 Talbot
 
 knew that
 
 Ballard
 
 had no commission ; he so states it in his claim: the facts confirm the statement; for, about an hour after
 
 Ballard
 
 had captured the Magdalena, he came up, and took a joint possession, hoping to cover the capture by his commission, and thus to legalise
 
 Ballard’s
 
 spoliation. How silly and contemptible is cunning—how vile and debasing is fraud. In furnishing
 
 Ballard
 
 with guns, in aiding him to arm and outfit, in co-operating with him on the high seas, and using him as the instrument and means of capturing vessels,
 
 Talbot
 
 assumed a new character, and instead of pursuing his commission acted in opposition to it. If he was a
 
 French
 
 citizen, duly naturalized, and if, as such, he had a commission, fairly obtained, he was authorized to capture ships belonging to the enemies of the
 
 French
 
 Republic, but not warranted in deducing the citizens of neutral nations from their duty, and assisting them in committing depredations upon friendly powers. His commission did not authorize him to abet the predatory schemes of an illegal cruiser on the high seas ; and if he undertook to do so, he unquestionably deviated from the path of duty.
 
 Talbot
 
 was an original trespasser, for he was concerned in the illegal outfit of the
 
 Ami de la Liberte.
 
 Shall he then reap any benefit from her captures, when brought within
 
 *157
 
 the
 
 United States
 
 ? Besides, it is in evidence, that
 
 Ballard
 
 took possession first of the
 
 Magdalena,
 
 and put on board of her a prize-master and some hands ;
 
 Talbot,
 
 in about an hour, after, came up, and also put on board a prize-matter, and other men. The possession in the first instance was
 
 Ballard’s
 
 ; he was not ousted of it; they prey was not taken from him; indeed, it was never intended to deprive him of it. So far from it, that it was an artifice to cover the booty.
 
 Talbot’s
 
 possession was gained by a fraudulent cooperation with
 
 Ballard,
 
 a citizen of the
 
 United States,
 
 and was a mere fetch or contrivance in order to secure the capture.
 
 Ballard
 
 still continued in possession. The
 
 Magdalena
 
 thus, taken and possessed, was carried into
 
 Charleston.
 
 Can there be a doubt with respect to restoration ? Stating the case answers the question. It has been said that
 
 Ballard
 
 had a commission, and acted under it. The point has already been considered, and indeed is not worth debating; the commission, if any, was illegal, and of course the feizures were so. But then what effect has this upon
 
 Talbot
 
 ? Does it make his case better or worse f The truth is, that
 
 Talbot
 
 knew that
 
 Ballard
 
 had no commission, and he also knew the precise case and situation of the
 
 Ami de la Liberte
 
 ; to whom, she belonged, where sitted out, and for what purpose.
 
 Talbot
 
 gave
 
 Ballard
 
 guns within the jurisdiction of the
 
 United States,
 
 and thus aided in making him an illegal cruizer; he consorted and acted with him, and was a participant in the iniquity and fraud. In short,
 
 Ballard took the Magdalena,
 
 had the possession of her, and kept it;
 
 Talbot
 
 was in under
 
 Ballard
 
 by connivance and fraud, not with a view to oust him of the prize, but to cover and secure it; not with a view to bring him into judgment as a transgressor against the law of nations, but to intercept the stroke of justice and prevent his being punished. If
 
 Talbot
 
 procured possession of the
 
 Magdalena,
 
 through the medium of
 
 Ballard,
 
 a citizen of the
 
 United States,
 
 and then brought her within the jurisdiction of the said States, would it not be the duty of the competent authority to order her to be restored ? The principle deducible from the law of nation's, is plain;—you shall not make use of our neutral arm, to capture vessels of your enemies, but of our friends. If you do, and bring the captured vessels within our jurisdiction, restitution will be awarded. Both the powers, in the' present instance, though enemies to each other, are friends of the
 
 United States
 
 ; whole citizens ought to preserve a neutral attitude; and should not assist either party in their hostile operations. But if, as is agreed on all hands,
 
 Ballard
 
 first, took possession of the
 
 Magdalena,
 
 and if he continued in possession, and brought her within the jurisdiction of the
 
 United States,
 
 which I take to be the case, then no question can arise with respect to the legality
 
 *158
 
 of restitution. It is an act of justice, resulting from the law of nations, to restore to the friendly power the possession of his vessel, which a citizen of the
 
 United States
 
 illegally obtained, and to place
 
 Foost Fansen,
 
 the master of the
 
 Magdalena,
 
 in his former state, from whence he had been removed by the improper interference, and hostile demeanor of
 
 Ballard.
 
 Besides, it is right to conduct all cases of this kind, in such a manner, as that the persons guilty of fraud, should not gain by it. Hence the efficacy of the legal principle, that no man shall set up his own fraud or iniquity, as a ground of action or defence. This maxim applies forcibly to the present case, which, in my apprehension, is a fraud upon the principles of neutrality, a fraud upon the law of nations, and an insult, as well as a fraud, against the
 
 United
 
 States, and the Republic of
 
 France.
 

 I am, therefore, of opinion, that the decree of the Circuit Court ought to be affirmed. Being clear on the preceding points, it supersedes the necessity of deciding upon other great questions in the cause ; such as, whether
 
 Redick
 
 and
 
 Talbot
 
 were
 
 French
 
 citizens; whether the bill of sale was colourable and fraudulent; whether
 
 Redick,
 
 if a
 
 French
 
 citizen, did not lend his name as a cover ; and whether the property did not continue in
 
 Sinclair
 
 and
 
 Wilson,
 
 citizens of the
 
 United States.
 

 Iredell, Justice.
 

 In delivering my opinion on the great points arising in this case, I shall divide the consideration of it under the following heads:
 

 1. Whether the District Court had jurisdiction prima
 
 facie
 
 upon the subject matter of the libel, taking for granted that the allegations in it Were true.
 

 2. Admitting that the court had jurisdiction
 
 prima
 
 facie, whether
 
 William Talbot
 
 had stated and supported a case sufficient to entitle him to hold the property as prize, exempt from the jurisdiction and controul of the District Court.
 

 Í. The first enquiry is,
 

 Whether the district Court had jurisdiction
 
 prima facie
 
 upon the subject matter of the libel, taking for granted that the allegations in it were true.
 

 These allegations in substance are,
 

 That the ship was taken on the high seas, by a schooner called L'
 
 Ami de la Liberte,
 
 commanded by
 
 Edward Ballard,
 
 who had no lawful commission, to take her as the property of an enemy of the
 
 French
 
 Republic, under whose authority the capture was alledged to be made.
 

 That
 
 William Talbot,
 
 who came up after the surrender, and put some men on board, when; the'prize was in possession of
 
 Ballard,
 
 had also no lawful commission for the purpose of such a capture, being an American citizen, and his owners American citizens likewise.
 

 
 *159
 
 That there was fraud and collusion between
 
 Talbot
 
 and
 
 Ballard,
 
 both vessels being in fact the property of the same owners,
 
 Wilson
 
 and Sincliar, who were American citizens.
 

 Such, substantially, are the allegations of the libel, and admitting them to be true, nothing is more, clear than that the capture was unlawful.
 

 But it is objected that this is a question of
 
 prize
 
 of
 
 no prize,
 
 and whether the ship was lawfully a prize, or not, is for some court of the
 
 French
 
 Republic alone to determine, under wholauthority
 
 Ballard
 
 and
 
 Talbot
 
 alledge they acted; and it is contended, that the capture in question being of a
 
 Dutch
 
 ship, and not an American, the
 
 United States
 
 have no right to decide a dispute between the
 
 Dutch
 
 and the French, in regard to a capture on the high seas, claimed as lawful by one party, and denied to be such by the other, since such an interposition would be equally a violation of the law of nations, and of the 17th article of the treaty with
 
 France.
 

 To this objection, the following answers appear to me to be satisfactory:
 

 1. That it is true, both by the law of nations, and the treaty with France, if a
 
 French
 
 privateer brings an enemy’s ship into our ports,, which she has taken as prize oh the high seas, the
 
 United States,
 
 as a nation, have no right to detain her, or make any enquiry into the circumstances of the capture.
 

 But this exemption from enquiry, by our courts of :uftice, in this refpefi, only belongs to a
 
 French privateer, lawfully com-miffioned,
 
 and, therefore, if a veffel claims that exemption, but does not appear to be duly-entitled to it, it is the éxprefs duty of the court, upon application, to make enquiry,
 
 'whether fin is the vessel fie pretends, to be,
 
 lince her title to fuch exemption, depends
 
 on that very fact.
 

 Otherwise, any vessel whatever, under a colour of that kind, might capture with impunity, and defy all enquiry, if she kept out of a
 
 French
 
 port, equally in violation of the law of nations, and insulting to the
 
 French
 
 Republic, which, from a regard to its own honour and a principle of justice, would undoubtedly disdain all piratical assistance. She might say, now, I trust, with as much truth as dignity,
 
 Non tali auxilio, nec Defensoribus if is tempus eget.
 

 2. That such, an enquiry being thus proper to be made, if upon the enquiry it shall appear, that the vessel pretending to be a lawful privateer, is really not such, but uses a colourable commission for the purposes of plunder, she is to be considered by the law of nations, so far at least as a transfer of properly is concerned, or a title to hold it infilled upon, in the same light as having no commission at all.
 

 3. That
 
 prima facie
 
 all piracies and trespasses committed
 
 *160
 
 against the general law of nations, are enquirable, and maybe proceeded against, in any nation where no
 
 special exemption
 
 can be maintained, either by the general law of nations, or by some treaty which forbids or restrains it.
 

 It is expressly held, in an authority quoted
 
 I Lex Mercatoria
 
 252. “ That if a
 
 Spaniard
 
 robs a
 
 Frenchman
 
 on the high “ feas, their princes being both then in amity with the crown “ of
 
 England,
 
 and the ship is brought into a port in
 
 England,
 
 “ the
 
 Frenchman
 
 may proceed
 
 criminaliter
 
 against the
 
 Span
 
 i
 
 ard,
 
 to punish him, and
 
 civiliter,
 
 to have restitution of his “vessel.” The authorities referred to are,
 
 Selden mare claus. Lib.
 
 I
 
 chap.
 
 27.
 
 Grotius de Jure Belli et
 
 Pacis,
 
 b.
 
 3.
 
 c.
 
 9.
 
 f.
 
 16. both books of very high authority.
 

 What is called robbery on the land, is piracy if committed at fea. 3
 
 In ft.
 
 113. 1
 
 Com. Dig.
 
 269. And as every robbery oh land includes a trespass, so does every piracy at fea. 1
 
 Com. Dig.
 
 268. Consequently, if there be an unlawful taking, it may be piracy or trespass according to the circumstances of the case, both being equally unlawful, though one a higher species of offence than the other, which cannot alter the intrinsic illegality of the fact common to both, hut only occasion a greater or less degree of punishment proportioned to the nature of the offence. It is, therefore, no answer to say, in bar of restitution, that no piracy has been committed, and therefore no restitution is to follow,since, if a trespass has been committed, though not a piracy, restitution is equally proper as if the offence had amounted to piracy itself.
 

 4. That by a due consideration of the law of nations, whatever opinions may have prevailed formerly to the contrary, no hostilities of any kind, except in necessary self-defence, can lawfully be practised by one,individual of a nation, against an individual of any other nation at enmity with it, but in virtue of some public authority. War can alone be entered into by national authority; it is instituted for national purposes, and directed to national objects ; and each individual on both sides is engaged in it as a member of the society to which he belongs, not from motives of personal malignity and ill will. He is not to fly like a tyger upon bis prey, the moment he sees an individual of his enemy before him. Such savage nations, I believe, obtained formerly. Thank God, more rational ones have succeeded, and a liberal man can frequently fee great integrity and honor on both sides, though different and irreconcileable views of national interest or principles may unfortunately engage two nations in hostility. Even in the case of one enemy against another enemy, therefore, there is no colour
 
 of justification
 
 for; any offensive hostile act, unless it be authorised
 
 *161
 
 by some act of the government giving the public constitutional function to it.
 

 5. That nowithstanding an apparent contrariety of opinions on this subject, it would be easy to shew, upon principle, if not by authority, that such hostility committed without public authority on the high feas, is not merely an offence against the nation of the individual committing the injury, but also against the law of nations, and, of course, cognizable in either countries : But that is not material in the present stage of the enquiry, which affects only the conduct of our own citizens in our own vessels, attacking and taking, under colour of a foreign commission, on the high feas, goods of our friends.
 

 This is so palpable a violation of our own law (I mean the common law, of which the law of nations is a part, as it subsisted either before the act of Congress on the subject, or since that has provided a particular manner of enforcing it,) as well as of the law of nations generally; that I cannot entertain the flighted: doubt, but that upon the case of the libel,
 
 prima
 
 facie, the District Court had jurisdiction.
 

 2. The next enquiry is,
 

 Whether
 
 William Talbot
 
 has stated and supported a case sufficient to entitle him to hold the property as prize, exempt from the jurisdiction of the District Court.
 

 This claim is grounded as follows :
 

 1. That at the time of his receiving the commission, and at the time of the capture, he was a real
 
 French
 
 citizen, and his vessel was
 
 French
 
 property, viz. the property of
 
 Samuel Redick,
 
 a
 
 French
 
 citizen at
 
 Point-a-Pitre-
 
 in
 
 Guadaloupe.
 

 2. That he had a lawful commiflion to cruize from the
 
 French
 
 Republic.
 

 3. That whether
 
 Ballard
 
 had a lawful commission or not, he himself was lawfully entitled: 1. To part, if
 
 Ballard
 
 had a lawful commission, as having been in fight at the time of the capture, and therefore contributing to intimidate the enemy into a surrender upon the common principle. 2. If
 
 Ballard
 
 had no lawful commission, and is to be considered as a pirate, his capture did not change the property; of course, it remained Dutch, and he, as captain of a
 
 French
 
 privateer, had a right to feize and retain it.
 

 The first point to be considered is,
 

 Whether
 
 Talbot
 
 at the time of his receiving the commission, and at the time of the capture, was a
 
 French
 
 citizen.
 

 This involves the great question as to the right of expatriation, upon which so much has been said in this cause. Perhaps it is not necessary it should be explicitly decided on this occasion; but I shall freely express my sentiments on the subject.
 

 
 *162
 
 That a man ought not to be a slave; that he should not be confined against his will to a particular spot, because he happened to draw his first - breath upon it; that he should not be compelled to continue in a society to which he is accidentally attached, when he can better his situation elsewhere, much less when he must starve in one country, and may live comfortably in another; are positions which I hold as strongly as any man, and they are such as most nations in the world appear clearly to recognize.
 

 The only difference of opinion is, as to the proper manner of executing this right.
 

 Some hold, that it is a natural unalienable right in each individual ; that it is a right upon which no act of legislation can lawfully be exercised, inasmuch as a legislature might impose dangerous restraints upon it; and, of course, it must be left to every man’s will and pleasure, to go off, when, and in what manner, he pleases.
 

 This opinion is deserving of more deference, because it appears to have, the sanction of the Constitution of this State, if not of some other states in the Union.
 

 I must, however, presume to differ from it, for the following reasons:
 

 1.
 
 It is not the exercise of a natural right, in which the individual is to be considered as alone concerned. As every man is entitled to claim rights in society, which it is the duty of the society to protect; he, in his turn, is under a solemn obligation to discharge all those duties faithfully, which he owes, as a citizen, to the society of which he is a member, and as a, man to the several members of the society individually with whom he is associated. Therefore, if he has been in the exercise of any public trust, for which he has not fully accounted, he ought not to leave the society until he has accounted for it. If he owes money, he ought not to quit the country, and carry all his property with him, without leave of his creditors. Many other cases might be put, shewing the importance of the public having some hold of him, until he has fairly performed all those duties which remain unperformed, before he can honestly abandon the society forever. But it is said, his ceasing to be a citizen, does not deprive the public, or any individual of it, of remedies in these respects : Yet the right of emigration is aid to carry with it the right of removing his family, and effects. What hold have they of him afterwards ?
 

 2. Some writers on the subject of expatriation say, a man shall not expatriate in a time of war, so as to do a prejudice to his country. But if it be a natural, unalienable, right, upon the footing of mere private will, who can say this shall not be exerciled in time of war, as well as in time of peace, since the
 
 *163
 
 individual, Upon that principle, is to think of himfelf Only ? I therefore, think, with one of the gentlemen for the defendant that the principle goes to a {late of war, as well as peace, and it mufir involve a time of the greateft public calamity, as well as the profoundeft tranquillity.
 

 3. The very statement of an exception
 
 in time of war,
 
 shews that the writers on the law of nations, upon the subject in general, plainly mean, not that it is a right to be always exercised without the leaft restraint of his own will and pleasure, but that it is a reasonable and moral right which every man ought to be allowed to exercise, with no other limitation than such as the public safety or interest requires, to which all private rights ought and must forever give way. And if in any government, principles of patriotism and public good ought to predominate over mere private inclination, surely they ought to do so in a Republic founded on the very balls of equal rights, to be perfectly enjoyed in every instance, where the public good does not require a restraint.
 

 4. In fome inftances,
 
 even in time of
 
 war, expatriation may fairly be permitted. It ought not then to be. retrained. But who is to permit it ? The Legiflature furely; the conftant guardian of the public intereft, where a new law is to be made, or an old one difpeufed with, If they may take cognizance in One inftance, (as for example, in time of war) becaufe the public fafety may require it, why not in any other inftance, where the public fafety, for fome unknown caufe, may equally require it ? _ Upon the eve of a war, it may be ftill more important to exercife it, as we often fee in cafe of embargoes.
 

 .5. The fuppóíítiori, that the power may be abufed, is. of no importance, if the public good requires its exercife. This fe.ver'Hh jealoufy, is a paflion that can never, be fatisfied. No man denies the propriety of the Legiflature having a taxative power. Suppofe it íhould be ferioufly objidled to, becaufe the Legiflature might tax to the amount of
 
 tqf.
 
 in the pound ? They have the power, bur does any man fear theexe.rcifeof ic ? A Legiflature mull pofiefs'every power necefiary to the making of laws. When conftrudted as ours is, there is no danger of any material abufe. But a Legiflature mifft be weak to the extremeft verge of folly, to wifli to retain any iban as a citizen, whofe heart and affedtións áre fixed on a foreign country, in preference to his-own. They would naturally wifli to get rid of him as foon as they could, and, therefore, perhaps, the proper precaution would be, to reftrain adts of ■ baniihment, (if fach could be at all permitted) rather than to limit the legifla-tivecontroul over expatriation. But .is there no danger of abufe on the other fide ? Have not all the contentions about, expatriation "in the courts, arifen from
 
 a want of the exercife
 
 
 *164
 

 of this very authority ?
 
 For, if-the Legiilature had prefcribed a mode, every one would know, whether it had or had not been purfued. and
 
 all
 
 rights,
 
 private as well as
 
 public,
 
 would be equally
 
 guarded; but upon the prefent doctrine, no rights are fecured, but thofe of the
 
 expatriator
 
 himfelf..
 

 I, therefore, have no doubt, that when-the queftion is in regard to a citizen of any country, whofe conftitution has not prohibited the exercife óf the legiflative power in this inftance, it not, only is a proper inftance in which it may be exercifed, but it is the duty of the Legiilature to make fuch provifion, and for my part, I have always thought thé
 
 Virginia
 
 afíembly ihew-ed a very judicious foreiight in this particular»
 

 Whether the'
 
 Virginia
 
 a<ft of expatriation be now in force, is a.queftion fo important, that I would not wiíh unneceilarily to decide it. If it be, I have no doubt that a citizen of that State, cannot expatriate himfelf in any other manner. It feems tnoft probable (but I think not certain) from this record,- that
 
 Talbot
 
 "was a citizen of
 
 Virginia.
 
 We are, however, undoubtedly to coniider him as a citizen of' the
 
 United States.
 
 Admitting he had a right to expatriate himfelf, without any law- pre-fcribing tbe method of his doing fo, we furely muft have feme evidence that he 1 ad done it. There is none, but that he went to the
 
 Weft
 
 Indies, and took an oath to the
 
 French
 
 Republic, and became a citizen.there. I do not think that merely taking fuch an oath, and being admitted a citizen there, initfelf, is evidence of a
 
 bona fide
 
 expatriation, or completely difeharges the obliga-tionshe owes to his own conntry. Had there been any reftric-tions by our own law on his quitting this country, could any a ¿i of a foreign country, operate as a repeal of thefe ? Certainly not, When he goes there, they know nothing of him, perhaps, but from his own reprefentation. He becomes a citizen of the new country, at his peril,- The a£t is complete, if he has legally quitted his own: if not, it is fubbrdinate to the allegiance he originally owed. By allegiance, I mean, that tie by which a'citizen of the
 
 United States
 
 is bound as a member of the fociety. Did any man fuppofe, when tbe rights of ci-tizenihip were fo freely and honorably Bellowed on the unfortunate
 
 Marquis de la
 
 Fayette, that
 
 that
 
 abfolved him, as a fub-je£t or citizen of his own country ? It had only'this effl-ét, that whenever he came into this conntry, and chofe to refide here, he was
 
 ipfo fia/rto
 
 to be deemed a citizen, without any thing farther. The fame confcqúence, I think, would follow in'refpeS to rights of eifizenihip, conferred by the
 
 French
 
 Republic, upon fome iiluftjious cbaraclers, in our own, and other countries, if merely intended, as ingeniouily fuggefted at the bar, that upon going to France, and performing the ufual requifites, they ihould be then
 
 French'
 
 citizens, where is the
 
 *165
 
 honour of it:—'Since any man may avail himfelf of‘an indif-criminate indulgence granted by law. Some difagreeable diJe.nmas, may be occafioned by this double citizenfhip, but the principles, as I have Rated them, appear to me to be warranted by law and rea fon, and if any difficulties arife, they fliew more ftrongly the importance of a law, regulating the cxercife of the right in queftion.
 

 His going to the
 
 Wejl
 
 Indies, and taking an oath of allegiance there, coniidering it in itfelf, is an equivocal act. It might be done, with a view to relinquiih his own country forever. It might be done, with a view to relinquiih it for a time, in order to gain fome temporary benefit by it. If the former, and this was clearly proved, it poffibly might have'the ciFeft contended for. If the latter, it would fliew, that he voluntarily fubm.itted to the émbarraflments of two diftinft allegiances. He muft make them as confiftcnt as he can. By our treaty with
 
 Holland,
 
 any
 
 American
 
 citizen, cruifing. upon
 
 Dutch
 
 fubjefts, as commander of a privateer, under a foreign' commiffion, is to be deemed a pirate. If he left America, for the very purpofe of doing this, and became a
 
 French
 
 citizen, that'he might have a colour for doing fo, then his taking a
 
 French
 
 commiffion could not abfolve him from a crime .which he was committing in the very aft of taking it, and of which the
 
 French
 
 government might not be aware, as they are ’not bound to take notice of any other treaties but their own. If he went, intending to refide there for a-time, and to aóí under a commiffion, which he believed would, for the prefentj juftify him, tho’ this might excufe him from the guilt of piracy, it would not make i'uch a contradi lawful, becaufe, in this cafe, even his intention Was not]
 
 to expatriate himfelf forever
 
 ; and, confequently, he Hill remained
 
 an American
 
 citizen, and had no authority to take a commiffion at all. It furely is impoffible for us to fay, he meant a real expatriation, when his conduft
 
 prima
 
 facie, as much indicates a crime, as any thing elie. If he had fuch an intention before he left this country, why not mention it If a citizen of Virginia, andtheir-aft of expatriation was not in force, yet, furely, it preferibed as good a method of eftefting'it as any other, andhisnot purfuingthis method, (if he really meant an expatriation) can be accounted for in no other manner, but that he was confcious, the vsflel he was fitting out, was for the purjiofe of cruifing, and would havebeer.ftopt by the government, had his delign of expatriation fo plainly evinced it.. •
 

 I therefore, muft fay, there is no evidence to fatisfy me, that, he ceafe'd to be an
 
 American
 
 citizen, fo as to be abfolved from the duties he owed' to his own country;. and, among others, that duty of not cruifing againft
 
 the Dutch,
 
 in violation of the law of nations, generally, andcf the treaty , with
 
 Flolland,
 
 in particular.
 

 
 *166
 

 My
 
 obfervations, as to Talbot, will, in a great meafure, apply to
 
 Redick,
 
 who appears to have been a citizen of
 
 Virginia.
 
 There is no evidence to fatisfy me, that he ceafed to be an
 
 American ziix’Ltn,
 
 and became a
 
 French
 
 citizen, afcfolvcd from the duty he owed, as a citizen, to his own country. There is nothing to ihaw this, but a refidence of no long duration, in a
 
 French
 
 Ifland, his taking an oath to the
 
 French
 
 Republic, and being admitted a
 
 French
 
 citizen, which, for the reafons I have given, I do not think fufficient.
 

 In addition to my other obfervations, I may add, how is it poffible, upon this principle, for the public to know in.what lit nation they Hand, as to any one of thefeperfons? Itisnotimpoffible, (I believe inftances indeed have already happened of it) that an
 
 American
 
 citizen may go to fome of the dominions of the French, become a
 
 French
 
 citizen for a time, enjoy all the benefits of fuch, and afterwards, return to his .own country, and claim, and enjoy, all the privileges of a citizen there, without the leaf!: poffibility of the public knowing, otherwife than
 
 from
 
 accident, whether he has become a citizen of another government, or not. S.uppofe one of them was to infift on hplding an eftate in land, devifed to him after his new citizen&ip, how could it be proved he was an alien ?
 

 Whether, therefore, the property of the privateer, was in-Redick, or in
 
 Wilfon
 
 and Sinclair, I think it was equally
 
 Ame-., rican
 
 property, tho’ I cenfefs, the weight of the evidence, im preffes.me ftrongly with a belief, that the property was
 
 Wilfon
 
 and
 
 Sinclair1 s. ■
 
 And, in regard to the objedtion, that nothing they could fay or do, or
 
 Talbot
 
 either, could affect
 
 Redick,
 
 I think, as
 
 Talbot
 
 appears as the agent of
 
 Redick,
 
 of whom, we know nothing but through him, his declarations are. to be regarded as
 
 Redick's
 
 own, and any declarations of
 
 Wilfon
 
 or
 
 Sinclair,
 
 in his prefence, and any of the conduit: of either of them, fan&ioned by him, muft have the fame effeit, as if the declarations had been made in the prefence of
 
 Redick,
 
 and fuch conduit fanitioned by himfelf.
 

 I confider the proof of the commiffion fufficient, but deny its operation, as I confider the veffel to have been an
 
 American
 
 vef-fel, owned by an
 
 American
 
 or Americans, and with an
 
 American
 
 Captain on board.
 

 I now proceed to enquire into the confequences
 
 of Bailar As
 
 capture, and
 
 Talbot's
 
 co-operation with him, tho’ perhaps, up-en my principles, it is'not absolutely neceffary.
 

 I.
 
 Ballard’s
 
 capture, I think, is clearly infupportable. Admitting him to have been expatriated, (which, if the
 
 Virginia
 
 Jaw was in force, I think he was) he did not become a
 
 French
 
 citizen at all. Only one of the crew was a
 
 Frenchman.
 
 I think, all the reft were proved to be Americans, or
 
 BngUJh.
 
 She
 
 *167
 
 -was fitted out in the
 
 United States.
 
 The commiffion, if good at all, was of a temporary and fecret nature, arid feems to have been confined toa fpecial purpnfe, to be executed within the
 
 United States.
 
 She certainly bad no authority to cruize, that being fpecified in every commiffion of that nature. Whoever were her owners, fire does not appear to have been
 
 French
 
 property. On the contrary, there is the higheit poffibility, that
 
 Talbot’s
 
 and.
 
 Ballard’s
 
 veffels had the fame owners. So con-fcious was hs of the illegality of his conduct,-that he even preferred no claim for the captured property. •
 

 • 2.
 
 Talbot
 
 (confidering hirafeif as mafter-of a lawful priya-teei) claims .upon two grounds:. 1. Upon fuppofition of
 
 Ballard's
 
 being a lawful commiffi'on,. he- claim's, as being in fight at the time of the capture. To this, it' isfufficient to fay, that it was not a lawful commiffion.
 
 %
 
 If
 
 Ballard
 
 had no lawful commiffion, he claims upon his independent right, alledging, that if
 
 Ballard
 
 had no lawful commiffion, the property was not changed to Ballard, and therefore he had a right to take.
 

 This claim (if
 
 Talbot’s
 
 was a lawful privateer) would undoubtedly be good, if he was not a confederate with
 
 Ballard.
 
 But it is clear that he was, that he cruized before and after, in company wiih him, that he put guns on board of- his veftel ; and there is the ftrongeft reafon to believe, that they both belonged to the fame owners. It is true, if
 
 Talbot
 
 had come up, ignorant of
 
 Ballard’s
 
 authority, and inadvertently put men on board the prize in conjunction with Ballard, fuppofing he had-a lawful commiffion, when in reality he had not, it might with fome reafon be' contended, that
 
 Talbot
 
 fiiould. hold the prize. But, wilful ignorance, is never excufeable ; when there is time to enquire, enquiry ought to be made. .There is not, however, the leaft reafon for fuppofing any ignorance in the cafe. He abetted
 
 Ballard’s
 
 authority, fuch as it. was. He acted in fupport of it, not in oppofition to it. It does not appear that he ever quéftioned it, until after his arrival in
 
 Charlejton.
 
 It was, therefore, a mere after-thcüght. A man having a com- . million, is authorized, but not compelled, to exercife it His will muft concur to make a capture under it. It does not appear, that he relied, at fea, upon his own force, but upon
 
 Bal
 
 lard’s; at leaft, in this inftancc, upon his own and
 
 Ballard’s,'
 
 in conjunction1. A man having a lawful commiffion, isautho-rifecl to cruize himfelf, and to cruize in company with others, having lawful authority. It docs not authoriie him to afibciate with pirates, or any unlawful depredators, on the high feas. If he does fo, he departs from his commiffion, a (Turnes a new cha-rafter,’ which that docs not author!fc, .and rifques all the con-fequences oí it. It is/impoffible that
 
 Ballard
 
 pan be guilty of-
 
 *168
 
 a crime, and
 
 Talbot,
 
 who aflbciated with him, in the wilful commiiiion of it, can be wholly innocent of it. A man can be guilty of no crime, in obeying a lawful commiifion. He, therefore, in this inftance, if guilty of a crime, mull be conft-dered altogether detached from a rightful authority, which he abandoned, in fearch of the profit of an illegal adventure. If, at fea, he ailed in fupport of
 
 Ballard’s
 
 claim, how can he claim now, on the principle of that being infupportahle ? At lea, was the place for him to make his option. He has no right, after the prize is brought into port, to fay—“ I made a “bad option there: I fupported
 
 Ballard’s
 
 claim, whereas! “ ought to have oppofed it, and Hood upon my own.
 
 I will
 
 “
 
 72ow take this Dutch J,hip as a
 
 prize,
 
 by my own authority.”
 
 For fuch, in efFedl, 1 take to be the fubitance of any claim, fuggefted after his arrival in port.
 

 Í therefore think, upon this ground, even admitting, that
 
 Talbot’s
 
 was a rightful privateer, his claim is iiifupportable.
 

 Wilson, Jujlice.
 

 As I decided this caufe in the Circuit Court, it gives me pleafure to be relieved from the neceifity of giving any opinion on the appeal, by the unanimity of fentnnent that prevails among rhe judges.
 

 Cushing, Jujlice.
 

 The fails in this cafe, fo fat as they appear to me to be eiibntial for forming an opinion, may be reduced to a very narrow ccmpafs, Ballard, the commander of a veil'd, -which was illegally fitted-out in the
 
 United
 
 States, cruizes in company with Talbot, who alledges that he is a
 
 French
 
 citizen, and produces a
 
 French
 
 commiifion.
 
 Ballard
 
 captures the Magdalena, a
 
 Dutch
 
 p: ize; then
 
 Talbot
 
 joins him ; and both, having put prize-maírers on board, bring the prize into the harbour of
 
 Charlejlon.
 
 The questions nrifing ■ on this ftatement are, limply, whether the capture, under fuch ciicumftances, is a violation of ohr treaty with
 
 Holland ?
 
 And whether it is fuch a cafe of prize, at the courts of the
 
 United Stales
 
 can take cognizance of, conhilently with the treaty between
 
 America
 
 and
 
 France?
 
 Now, the whole traniadtion at Gaitclaloupc, as well as here, prefents itfelf to my mind as fraudulent and collufive. But even fuppofing that
 
 hlalbot was, bona fide,
 
 a
 
 French
 
 citizen, the other circumftanccs-of the cafe are iufficient to render the capture void. It was, in truth, a capture by Ballard, who had no authority, or colour of authority, for his condudl. He was an
 
 Aynerican
 
 citizen; he had never left the
 
 United'States
 
 ; his veil'd was owned by
 
 American
 
 citizens; and the commiiiion, which he held by afiignment, was granted by a
 
 French
 
 admiral, within the-
 
 United States,
 
 to another-perlón, for a particular purpofe, but not for the pttr-poie of capture. Then, ihall not the property, which he has thus taken-from-a nation at peace with'the
 
 United States,
 
 and
 
 *169
 
 brought within our jurifdi&ion, be reftored to its owners ? Every principle of juftice, law and policy, unite in decreeing the affirmative; and there is no poiitive compadt with any power to prevent it.
 

 On the important right of expatriation; I do not think it ne-ceiTa.ry to give an opinion; but the.docftrine mentioned by
 
 Hci-
 
 n-eccius, feems to furnifh a reafonable and fatisfaflorv rule. The adf of expatriation ihould be
 
 buna
 
 fide, and maniídíced, at leaft, by the emigrant’s aifu'al removal, with his family and effedfs, into another country. This, however, forms no part of the ground, on which I think the decree of the Circuit Court ought to be affirmed.
 

 Rutledge,
 
 Chief
 
 JnJlice.
 

 The merits of the caufe are fu obvious, that I do not conceive there is much difficulty in pronouncing a fair and prompt deciiion, for affirming the decree of the Circuit Court.
 

 The dodfrine of expatriation is certainly of great magnitude; but it is not necefiary to give an opinion upon it, in the pre-fent caufe, there being no proof, that Captain
 
 Talbot's
 
 admif-iion as a citizen of the
 
 French
 
 Republic, was with a view to relinquifh his native country; and a man may, at the fame time, enjoy the rights of citizenihip under two governments.
 

 It appears, upon the whole, that
 
 Ballard's
 
 veil'd was illegally fitted out in the
 
 United
 
 States; and the weight of evidence fa&isfies my mind, that
 
 Talbot's
 
 veil'd, which was originally
 
 American
 
 property, continued fo at the time of the capture, notwithftanding all the fraudulent attempts to give it a different complexion. The capture, therefore, was a violation of the law of nations, and of the treaty with
 
 Holland.
 
 The court has a,clear jurifdidion of the caufe, upon the exprefs authority of
 
 Pelacbes's
 
 Cafe. q.
 
 Iijl.
 
 And every motive of good faith and juftice muft induce us to concur with the Cir-cit Court, in awarding reiiitution.
 

 The Decree
 
 of
 
 the Circuit Court affirmed.
 

 The Counfel for the Appellees, then moved the court to ailefs additional damages, which was oppofed by Dallas, for the Appellant; and, after argument, the following order was made:
 

 By the court:
 

 Ordered, that the decree of the Circuit Court
 
 of South Carolina
 
 diftriéf, pronounced on the 5th day of November, in the year of our Lord one thoufand feven hundred and ninety-four, affinning the decree of the Diftrici Com:: of the fame diftridt, pronounced on the fixth day of Angttjl, in the year of our Lord one thoufand feven hundred and ninelyty-four, be in all its parts eftabliíhed and affi -mcd. And it is further confidered, ordered, adjudged and decreed, that the laid
 
 William
 
 Talbot, the Plaintiff in do to the fa id
 
 *170
 
 Janfen, the Defendant in error, in addition to the fum of one thoufand feven hundred and fifty-five dollars fifty-three cents, for demurrage and' intereft, and eighty-two dollars for coils, in the decree of the faid Circut Court mentioned, demurrage for the detention and delay, of the faid brigantine
 
 Prouw Chrif-tina
 
 Magdalena, at the rate of nine dollars and thirty-three cents, lawful money of the
 
 United
 
 States,
 
 per
 
 diem, to be accounted from the fifth day of
 
 November
 
 laft pail, till the.fixth day of
 
 June
 
 laft, the day of the actual fale of the faid brigantine, under the interlocutory order of this court, of the third day of
 
 March
 
 laft pail, to wit, for two hundred and thirteen days, a fum of nineteen hundred and eighty-fev.en dollar* and twenty-nine cents; and alfo intereft: at the rate of feven per centum per annum, for two hundred and ninety days, on the fum of fifty-one thoufand eight hundred and forty five dollars, being the amount of the falesof the cargo ofthe faid brigantine heretofore fold, by order and permiflion of the faid' Diftridt Court, and making a fum of two thoufand eight hundred and eighty-three dollars and forty-two cents; and alfo a like fum of feven per centum per annum on the amount of fales of the faid brigantine
 
 Vrouw Chriftina
 
 Magdalena, under the order of this court, that is to fay, intereft for feventy-feven days, on the fum of eighteen hundred and twenty dollars, from the faid fixth day of
 
 June
 
 laft, making the fum of twenty-fix dollars and eighty-feven cents, the whole of which inteieft to be accounted to this day, and making together the fum of two thou-fand nine hundred arid ten dollars twenty-nine cents, lawful money of the
 
 United
 
 States; and which faid intereft and de-murrage, make together the fum of four thoufand eight hundred and ninety-feven dollars fifty-eight-cents, in addition to and exclufive of the demurrage intereft and coils adjudged in the faid Circuit Court of the
 
 United
 
 States, for
 
 South Carolina
 
 diftridl; alfo nine-one dollars and ninety-three cents, for his cods and charges : and that the faid
 
 Joojl Janfen
 
 have execution of this judgment, and decree by fpecial mandate to the faid Circuit; Court, and procefs agreeable to the a£l of the Congrels of the
 
 United-
 
 States, in that cafe made and provided