The honorable Benjamin Mills

dissented, and delivered his separate opinion, as follows:

AS I do not concur with a majority of this court, on several points decided in this cause, I have thought proper to deliver the reasons for my dissent.
The first important point of difference, is on the question, what constitutes a citizen of a state ? It is a short, but momentous question. On it important rights depend.
It has been contended in argument, and admitted, that he alone, who is entitled to the highest honors of the government, is a citizen, and that all others can not be entitled to the appellation. If we go back to Rome, for the origin of the word, and search the history of that government, it will be found, that the native was a citizen, and such others, as the government by her laws adopted. We are told, in sacred history, that an apostle claimed the privilege of being a Roman citizen, before a Roman, officer. The officer enquired into his title, and his answer was, that he was free born. His plea was admitted, when at the same time he was a Jew, born in Tarsus, after Cilicia was annexed to the Roman empire, and by that birth alone must have been entitled to the claim. But, not to take up time in adducing authorities on this inquiry, if it be admitted that the right of citizenship at Rome was conferred, and not hereditary, it can have no effect upon this question. The American colonies brought *338 with them the common, and not the civil law; and each state, at the revolution, adopted either more or less of it, and not one of them exploded the principle, that the place of birth conferred citizenship. Indeed, the very argument, that being born in England makes a subject, shows that being born here makes a citizen. Ought the subject of the English crown to be allowed to boast of his privileges, secured as a subject, as his birthright, and can no American citizen claim citizenship as his inheritance ? I would be unwilling to avow, that none of our offspring are born citizens, and that the right to that endearing appellation must be afterwards conferred by municipal regulation. But let the position be assumed, that none are citizens but those entitled to the highest honors of the state, and it follows that no person, who is not a white male, and has not resided here for six years, and is not of the age of thirty-five years, can be a citizen ; for such must be the qualifications of our chief magistrate. The persons of this description in Kentucky, do not compose more than one fifth of the white population of the state. In Virginia, those entitled to office and suffrage, must not only possess age and residence, but a freehold. Such freeholders compose, probably, not more than one tenth of her white population. If we pursue the same measure of calculation throughout the Union, it will be found that probably not more than one eighth of the white persons in the whole number of states, would be entitled to the highest offices in the different states, according to their respective constitutions. Can it, then, be compatible with the spirit or letter of the constitution of the United States, to say, and that by construction, that when it speaks of 'citizen' of a state, it only intends one eighth its population ; that the aristocracy of each state alone, is embraced—their rights secured; while nothing is secured by its provisions to the great mass, the full seven eighths of the whole ? Such a construction is much too limited, and if applied to that instrument, or to the constitution of our own state, it will be found that the rights of the few, and not the many are protected by them.
We will here take occasion to mention the case of white females and infants. They, being not entitled to political advancement, cannot be citizens. The only answer given to this, is, that they are represented *339 by the citizen males, such as their husbands, fathers or guardians. But what becomes of the widows and maids of mature age, and of the unprotected orphan ? They have no such representative, and therefore are not citizens. Suppose a posthumous infant may never have a guardian, until he arrives to the age of thirty five years, can he be a citizen. He was not born one; he had no citizen parent to represent him, and he has no provision made for him by law, authorising him to become naturalized ; and, of course, he must live all his life neither a citizen nor an alien.
Again, according to a well settled principle of the common law, now in force, none but citizens can hold our lands. By what authority, then, do single females, infants, or persons under thirty five hold them? Do the patents, conveyances and devises to such persons pass any title ? Cannot the legislature forfeit and take away all such lands, bar all rights of action vested in such persons, and even make them slaves ? For if none but citizens are protected by such constitutional provisions as the one in question, and such persons are not citizens, it follows, that there is no barrier against such invasions of their rights.
But again, if the definition of a citizen contended for, is correct in Virginia, persons of proper constitutional age, and possessing a freehold, are the only citizens; the rest are not. Let a white male, of full age, a native of Virginia, migrate to this country, who never held land there, and set up the privilege of a citizen of this state, under this clause of the constitution of the United States, which declares that “citizens of each state shall be entitled to all the privileges and immunities of citizens in the several states;" his claim, according to the doctrine contended for, must be disallowed. He never was a citizen of Virginia, and therefore cannot be entitled to the privileges of a citizen here. His right to hold office, or to vote, may be well questioned; his right to hold land may be disputed, and even his right to breathe the air or tread the soil, may be denied ; he may be banished, or subjugated to slavery, in despite of all constitutional provisions. This, we know, is contrary to the universal understanding and practice in this and every other state. Such have held offices and filled our legislature ; have voted, and held lands, without it ever hav *340 ing entered the head of any individual to question the propriety of it.
But let us suppose again, that a citizen of this state, duly qualified to hold any office, removes to Virginia, but does not acquire land there. By the clause of the constitution now in question, he is entitled to the privileges of a citizen there. He may vote and hold office, the constitution of Virginia notwithstanding ; not because he is entitled to those privileges in Virginia, but because he acquired them here. Thus, the constitution Virginia must be prostrated before the provision in question, and one state must and will determine the rights, and qualification for office and suffrage, in an other. The same answer may be given to all the clauses of our constitution, if this definition of a citizen is adhered to, which require residence, previous to the exercise of office and suffrage. Every citizen of any other state, so soon as he places his foot here, may contend, logically, that the rights of office and suffrage alone constitute a citizen ; that he had these rights in the state from which he has come, and that, consequently, under the constitution of the United States, he possesses them here, and our constitution must yield. Such a doctrine would tend more to the consolidation of our government, than any yet promulgated.
These are but a few of many singular and perplexing consequences, which must grow out of the definition of the word, citizen, contended for as the true one, when used in the federal constitution.
A further argument against this definition of a citizen, within the meaning of the constitution of the United States, is taken from authority, and the uniform construction of the constitution of the United States, as well as is expressions in other parts of the same instrument. The 5th section of the 2d article, provides, “ that no person, except a nutural born citizen,” shall become president. A plain acknowledgment, that a man may become a citizen by birth, and that he may be born such. The 2d section of the 3d article provides, that the judicial power of the United States shall extend to cases between “citizens of different states,” and “citizens” of the same state, claiming lands under different states. These clauses have ever been construed to extend to all those born and *341 residing in different states, by numerous decisions of that court. Females as well as males, infants as well as adults, have been allowed to sue there. The important inquiry has been, on questions of jurisdiction, where were the parties born, or where do they reside ? It never has extended to the question, are the parties entitled to office and suffrage, where they reside, which would be the proper inquiry, if the definition of the word, citizen, now contended for, is correct. If the doctrine is correct, it will sweep more suits from the docket of the federal court, than any other expedient ; and if it can be maintained, that those only who are entitled to the highest honors of a state, are citizens there, none but such can sue in the federal courts, and they must have egregiously erred, in entertaining, for upwards of thirty years, jurisdiction between any other persons.-See Knox, &c. vs. Greenleaf, 4 Dall. 360, and many subsequent cases. Proof of the place of birth, in that court, has always been thought sufficient. Here the inquiry ceased. That court has doubted, upon what acts could undo and destroy citizenship conferred by birth ; but has never thought it conferred nothing—Talbot vs. Jansen, 3 Dall. 133; Murray vs. Betsey, 2 Cranch 119. In the case, Campbell vs. Gordon and wife, 6 Cranch 176, under the expressions of the act of congress conferring citizenship on the children of aliens who should become naturalized, it is expressly decided, that citizenship was conferred on a female infant, and that she was a citizen. It is thought unnecessary to extend authorities further on this point; for the very silence of the books, in not extending the inquiry to office and suffrage, is a host of authorities itself. Hence I conclude, that every white person atleast, born within the United States, whether male or female, is, by birth, a citizen, within the meaning of our constitution; and as such, has rights secured by it, although born of alien parents. If this doctrine be not correct, the multitudes who flocked to our shores, at our invitation, after the revolution, have produced among us, on our own soil, a numerous offspring, composing a great part of the present generation, who have no right to office or suffrage, or to hold lands, or remain among us, if we require them to depart; a doctrine fraught with fearful consequences indeed. The definition of a citizen, *342 therefore, contended for, cannot be correct. The question then recurs, what is a citizen ?
The mistake on this subject must arise from not attending to a sensible distinction between political and civil rights. The latter constitutes the citizen, while the former are not necessary ingredients. A state may deny all her political rights to an individual, and yet he may be a citizen. The rights of office and suffrage are political purely, and are denied by some or all the states, to part of their population, who are still citizens. A citizen, then, is one who owes to government, allegiance, service, and money by way of taxation, and to whom the government in turn, grants and guarantees liberty of person and of conscience, the right of acquiring and possessing property, of marriage and the social relations, of suit and defence, and security in person, estate and reputation. These, with some others which might be enumerated, being guaranteed and secured by government, constitute a citizen. To aliens, we extend these privileges by courtesy; to others, we secure them—to male as well as female, to the infant as well as the person of hoary hairs. To all such, I would extend the clause in question, and then none of the perplexing consequences above enumerated will result. The citizen of Kentucky, who removes to Virginia, will have the benefit of it, although, for want of a freehold, that state may deny him the right to vote. The citizen of Virginia, who there never could vote, may vote here, after a sufficient residence, and the constitution of the United States and those of the different states receive their full effect, and move on harmoniously together; and it need not be contended, that the citizen of one state, having a right to vote where he resided, removing to another, has the right to vote, until he becomes qualified as the constitution of his newly adopted state requires.
I now come to apply this doctrine to the case of the unhappy subject of this suit, which is a task of delicacy and difficulty. Of delicacy, because a subject of the same nature has lately been discussed in our national councils, with regard to the admission of a sister state, when danger of marring the Union was rearing its head. Of difficulty, because most have taken part in this late contest, with feelings liable to extremes, leaving the truth in the middle ; and more *343 particularly, because the grade or Station in society of free African blacks, is now to be settled and ascertained as our interest dictates, by after thoughts, and by a subsequent generation to those, who, at the time of, and after our revolutionary struggle, did not expressly say that they should be citizens, or that they should be excluded from that privilege. We, therefore, have now to explore their acts, and conjecture, measurably, what our fathers intended, at a time when our interest and our passions may prejudice our judgments.
I waive the questions, whether any slave, emancipated in any manner, since the adoption of the federal constitution, can become a citizen, because born here; and whether any state can provide for the emancipation of these creatures, so as to make them citizens, while congress holds the power of adopting an uniform mode of naturalization. These questions are not involved in the case of Amy. Hence, the late Missouri question does not completely embrace it.
If Amy is entitled to her freedom, she acquired it previous to the adoption of the federal constitution, when there was nothing else binding the union together, but the articles of confederation. At that time, each state had the right of making what citizens it pleased ; and if that privilege had been bestowed by any one, on the Bashaw of Tripoli, he must then, and would ever since have remained a citizen. The constitution, when adopted, recognized all those then made, and provided for making them in future. The question, then, is, what did Pennsylvania do, with regard to the appellant ? In the preamble of the abolition act, passed the first day of March 1780, the legislature declares, that “they rejoice it is in their power to extend a portion of that freedom to others, which had been extended to them,’’ and that “they esteem it a peculiar blessing granted to them, that they were enabled, on that day, to add one more step to universal civilization, by removing, as much as possible, the sorrows of those who had lived in undeserved bondage.” The enacting part of this statute is clear and explicit. It declares, that all born after the passage of the act, should not be slaves, and then provides that all then in the state, whether slaves or servants until the age of thirty-one years, should be registered in the *344 proper office ; and declares that all not so registered, should not be considered as slaves or servants for life, but thereafter “ be deemed, adjudged and holden, within the territories of this commonwealth, as free men and free women.” Certainly, in a grant like this, nothing can be withheld, which was necessary to vest all civil rights. It certainly conferred as much as the preamble promised : that is, as much as possible. Besides, it is impossible to read the preamble and the whole act, and see the glow of liberty that burned in the bosom of the legislators, and suppose that they intended to keep any thing back. Could they then have been asked for an exposition of their own transactions, and enquired of, whether they intended to make citizens or aliens of these creatures, or a kind of nondescripts, neither citizens nor aliens, but subjects of the republic, they would have responded unanimously, “ citizens.” Had they been told, or could they have conjectured, that a subsequent generation, in a distant clime, would, by any definition of the word, citizen, have attempted to lessen the rights then conferred, they would have inserted the entire word, “ citizen,” in every necessary place, so as to leave no doubt on the matter. They have, however, placed the substance there, which will remain the same, whatever terms subsequent instruments or constitutions may have employed.
Hence I conclude, that the act in question did confer upon Amy all civil rights above enumerated, and consequently, made her a citizen. The question then results, how was this grant preserved ? The articles of confederation, then in force, provided, in the fourth article, that “the free inhabitants of each of these states, paupers, vagabonds and fugitives from justice excepted, shall be entitled to all privileges and immunities of free citizens, in the several states.” Under this article, the rights of the appellant were preserved in Maryland and Virginia, whither she went. Their laws did not oppose it. No law debarred her. Was she, then, a free inhabitant of Pennsylvania, by statute, and neither a pauper, vagabond nor fugitive from justice ? The privileges and immunities of a free citizen were secured to her in Virginia and Maryland, even though the appellation of citizen could not be applied to her. At the adoption of the federal constitu *345 tion, these rights were recognized and secured ; and all attempts to debar her of them, such as the act of our legislature in question, are repugnant to that constitution, as well as the constitution of this state, which declares, in favor, of such citizens, “ that all courts shall be open, and every person shall have remedy by due course of law, and right and justice administered, without sale, denial or delay."
I am aware, that this construction of the articles of confederation authorises each state to make citizens, and impose them upon other states, against their feelings and prejudices, and even requires each state to recognize the free inhabitants of one, in another, as free citizens ; yet this singular spectacle was presented under the articles of confederation, and such imperfections pointed the wisdom of that day to the adoption of the federal constitution. Apply these provisions to a white person even, of some barbarous nation, who had obtained such a grant from Pennsylvania as Amy did, and I could not sustain the limitation adopted by the law of this state, which gives right by taking away remedy. In other words, makes those slaves, whose right to freedom rests on the laws of a state, which never has, and never could recall its grant. That there may be such citizens, the constitution of this state supposes, in the 8th section of the 2d article, where it speaks of every free citizen, negroes, mulattoes and Indians excepted. But admit this conclusion to he incorrect, and that the act relied on as a bar in this case is constitutional, I do not conceive that it applies to a case where the party seeking freedom has been in the enjoyment of liberty, as Amy was in Virginia. If that application be correct, it enslaves again all those who have regained their liberty, for not being registered under the laws of Virginia and Pennsylvania. If they can be reclaimed and remedy is demanded, it is but to reply the act, and remedy is gone, without regard to lapse of time since the reclamation of the property. To such as claim their freedom by reason of their actual enjoyment, to the knowledge of the master, it ought not to apply. A right thus recognized, ought not to be held to come within the act.
I also dissent from the instruction given by the court below, on the paid of the appellee, that if the ju *346 ry found, from the evidence, that the mother of Amy was a slave, and that she was not emancipated according to the laws of Pennsylvania, Maryland or Virginia, and that she was purchased by the defendant below as a slave, the said Amy was not entitled to her freedom, and that they ought to find for the defendant. To say the least of this instruction, it was ambiguous and equivocal. Before it was asked, the laws of Pennsylvania, Maryland and Virginia, authorising masters voluntarily to emancipate, were read, and the design of it appears to be, to cause the jury to be told, that if the appellant had not obtained her freedom by an emancipation made by her master under these laws, she could not recover. If this was not intended, why use the word, “ emancipated,” instead of the words, “ acquired her freedom ?” Why lay a stress on the purchase of the defendant as a slave, if it was not intended to broach the doctrine, that the purchase as a slave, barred all other rights of freedom vested by law, except that of the emancipation by the master; and to induce the jury to believe that writing or record, evidencing freedom, was necessary, and that there must, as in the case of forfeited estates, be something like an inquest of office, before the right could be coerced by suit ? In another point of view, this instruction is untenable. Amy set up a claim, that she belonged to that class of servants in Pennsylvania, who were servants until thirty one years of age. This claim was excluded from the consideration of the jury, by the instruction given.
Nor is the instruction relative to the will of Christian Gingery, free from objection. That court did not err in telling the jury that the will did not emancipate Amy ; but when asked to explain the instruction, or rather to let the will go to the jury, and that the devise of Amy for only thirty one years, might be weighed by them as a circumstance conducing, with other evidence, to show her claim, the court refused. It had been proved, that the Gingerys, who owned her, acknowledged that she was to be free at the age of thirty or upwards. The statute of Pennsylvania mentioned, recognized a class of that character. About the time, or after she was thirty-one, it was shown that she enjoyed her freedom in the neighborhood of those who claimed her and afterwards sold her *347 to the appellee. The devise in the will harmonized very well with this evidence, and might have been used to aid her claim of that character; and as such it might have been left to the jury. If her claim was of that character, it cannot be pretended that the statute of limitations applied to it.
Nor do I concur in deciding that the want of a replication in this case bars the appeal. The cases establishing this doctrine, all turn upon the point that the plea might admit of different replications. In this case, however, the plea admits of but one answer, and cannot be avoided, but by a traverse of the matter alleged. Besides, the declaration and plea cannot both be true at the same time. She cannot have cause of action, and still be a slave. In the cases decided, the declaration and plea might both be true ; and there being no further answer given to the plea, and nothing disputed between the parties in the pleadings, of course judgment followed. Here, there is a contradiction, which each side maintains, and yet the judgment is affirmed, because there is no issue.