(PRIZE.)

## THE DIVINA PASTORA.—The *Spanish Consul,* Claimant.

The government of the United States having recognized the existence of a civil war between Spain and her colonies, but remaining neutral, the Courts of the Union are bound to consider as lawful, those acts which war authorizes, and which the new governments in South America may direct against their enemy.

Unless the neutral rights of the United States, (as ascertained by the law of nations, the acts of congress, and treaties,) are violated by the cruizers sailing under commissions from those governments, captures by them are to be regarded by us as other captures, *jure belli,* are regarded; the legality of which cannot be determined in the Courts of a neutral country.

Where the pleadings in a prize, or other admiralty cause, are too informal and defective to pronounce a final decree upon the merits, the cause will be remanded to the Circuit Court, with directions to permit the pleadings to be amended, and for farther proceedings.

APPEAL from the Circuit Court of Massachusetts.

The petition or libel, in this cause, by the Consul of his Catholic Majesty at Boston, alleges and propounds, 1. That there lately arrived at the port of New Bedford, in this district, and is now lying in the said port of N. B., a Spanish vessel, called the Esperanza, otherwise called the Divina Pastora, having on board a cargo, consisting of cocoa, cotton, indigo, hides, and horns, of great value, to wit, of the value of 10,000 dollars; that the said vessel is navigated by seven persons, who are all American citizens, as he is informed, and believes; and that there are no

other persons on board of said vessel, and none other were on board when the said vessel arrived at said port. That the aforesaid persons say, that the said vessel was bound on a voyage from Laguira to Cadiz in Spain, and that she was captured by a privateer, or armed vessel, sailing under a flag, which they denominate, the flag of La Plata ; and that they did intend to carry said vessel to some port in the West Indies, but, afterwards, came into the port of New Bedford. 2. That the said vessel and cargo purport to have been consigned to Antonio Seris, a merchant at Cadiz. 3. That the said Consul verily believes, that the said vessel has been captured and brought into the aforesaid port, contrary to the law of nations, and in violation of the rights of the said Antonio Seris, and that the said Antonio is justly and lawfully entitled to the possession of the said vessel and her cargo : concluding with a prayer, that the process of the Court may issue, directed to the Marshal of this district, or his deputy, requiring of them, respectively, to take the said vessel and cargo into custody, to the end, that due inquiry may be made into the facts pertaining to this case, and that the property may be adjudged, decreed, and restored, according to the just rights of whomsoever may be therein interested, and according to law and the comity which the United States have always manifested towards foreign nations.

The plea and answer of "Don Daniel Utley, a citizen of the free and independent United Provinces of Rio de la Plata, &c., in behalf of himself and all concerned, in the capture of the Spanish polacre brig

1819.

The Divina
Pastora.

Divina Pastora and her cargo, to the libel and peti-
tion exhibited by Don Juan Stoughton, Consul of his
Catholic Majesty, &c.," sets forth, that the said Utley,
by protestation, and not confessing or acknowledging
any of the matters and things in the libellant's peti-
tion and libel contained, to be true, in such manner
and form as the same are therein and thereby alleged,
for plea to the said libel and petition, says, that
the United Provinces of Rio de la Plata in South
America, are free and independent states, and, as
such, have the power to levy war and make peace,
raise armies and navies, &c. And that the Supreme
Provisional Director of said Provinces, at the fort of
Buenos Ayres, on the 25th day of October, 1815,
commissioned a certain schooner, called the Mango-
ree, to cruize against the vessels and effects of the
kingdom of Spain, and the subjects thereof, except-
ing only the Spanish Americans who defend their
liberty, and authorized one James Barnes to act as
commander of said schooner, and to seize and cap-
ture the vessels and effects of European Spaniards,
and bring them within the government of the United
Provinces, for adjudication, according to the law of na-
tions, Ferdinand VII., king of Spain, then being at
war with said provinces, and general reprisals hav-
ing been granted by said provisional government
against the European subjects of the said king.
That said schooner Mangoree, bearing the flag of
the said independent Provinces, sailed on a cruise
from the harbour of Buenos Ayres, within the said
Provinces, on or about the first day of January, 1816,
by virtue of said commission. And having touched

1819.

The Divina
Pastora.

at Port au Prince, in the island of Hispaniola, sailed again on said cruise, and on the 31st of October, 1816, on the high seas, &c. captured the polacre brig Divina Pastora, belonging to the said king, or to his European subjects, on board of which brig said Utley was put as prize-master. And the original crew of said prize was taken out by the said Barnes, &c., and put on board of said schooner Mangoree, and a prize crew sent on board the Pastora. And the said Barnes, &c., then appointed said Utley to the command of the said prize, and delivered to him a copy of his commission, &c., which the said Utley now brings with him, and respectfully submits to the inspection of this honourable Court. And thereupon, the said Utley proceeded to navigate the said prize from the place where she was captured to Port-au-Prince, in the island of Hispaniola, for the purpose of there procuring supplies and provisions, and thence proceeding to the port of Buenos Ayres. The plea then proceeds to state, that in the prosecution of the voyage, the prize vessel was compelled, by stress of weather, and want of provisions and water, to put into the port of New Bedford; and concludes with alleging, that by the law of nations, and the comity and respect due from one independent nation to another, it doth not pertain to this Court, nor is it within its cognizance, at all to interfere, or hold plea respecting said brig or goods on board, so taken as prize of war, and a prayer for restitution, with costs and damages.

The replication of the Spanish Consul states, that inasmuch as the said Utley, in his plea, admits that

the said vessel, and the cargo laden on board, were, on the 31st day of October, 1816, the property of a subject or subjects of his majesty Ferdinand VII., the said consul claims the same, as the property of such subject or subjects, the names of whom are to him, at present, unknown; excepting that he verily believes the same to be the lawful property of Antonio Seris, as he, in his petition, hath set forth: And avers, that the same ought to be restored and delivered up for the use of the Spanish owner or owners. The replication then proceeds to aver, that as the said vessel is stated in the plea to have been captured on the high seas by a certain armed vessel called the Mangoree, commanded by one James Barnes, which armed vessel is stated to have been commissioned under a certain authority called the United Provinces. of Rio de La Plata in South America, the said capture and seizure, &c. were piratical, or tortious, and contrary to the lawful and well known rights of the faithful subjects of his said majesty, to whom the same belonged at the time of such capture, &c., and that no right of property thereby vested in the said Barnes or Utley, or any other person or persons who were navigating and sailing in the said armed vessel called the Mangoree: 1st. Because, at the time when the said pretended capture as prize of war was made, &c., the several provinces situate in South America, and near to the river called Rio de la Plata, were provinces and colonies of his said majesty Ferdinand VII., and now are provinces and colonies of his said majesty; and that the same had been, for a long course of years, provinces and colonies of the suc-

cessive kings of Spain; and that all the people, persons, and inhabitants dwelling therein, were, on the 21st day of October, 1815, and for a long time before had been, and now are Spanish subjects, and did at the aforesaid times, and now do owe allegiance and fidelity to his said majesty. 2dly. Because the said subjects and persons, dwelling in the said provinces and colonies in South America, had not, on the 25th day of October, 1815, nor had any, or either of the said subjects and persons, then, or at any other time, any lawful right, power, or authority, to commission any vessel or vessels, or any person or persons whomsoever, to wage war against him, the said Ferdinand VII., nor against his subjects, or their persons, or property, by sea, or elsewhere; and that no person or persons whomsoever, could lawfully receive, and take from any person or persons in any of the said colonies or provinces, any commission, power, or authority, of right, to wage war, and make captures of any property on the high seas. 3dly. Because all captures made on the high seas, under the pretence of power or authority derived from, or in virtue of any such commission as set forth in said plea, is unlawful and piratical; and that all pretended captures and seizures, as prize of war, of property belonging to the subjects of his said majesty when made under such commissions as aforesaid, are cognizable by the Courts of nations at peace and in amity with his said majesty, which hold pleas of admiralty and maritime jurisdiction, and take cognizance of cases arising under the law of nations, whenever the property so captured is found within

their respective jurisdictions. . And as a further
ground for the claim of restitution to the original
Spanish owners, the replication recites the 6th, 9th,
and 14th articles of the treaty of 1795, between the
United States and Spain. And as a further ground
for the claim, it alleges, that the papers, exhibited
with the plea, and by which the capture is pretended
to be justified, are false and colourable ; that the
prize crew did not speak the Spanish language, and
were shipped at Port-au-Prince ; that one of the
crew stated in his affidavit that the flag of the priva-
teer was obtained at that place ; and that all of them
stated, that the Divina Pastora, from the time of her
capture, was ordered for, and bound to the same
place, all the captured persons having been previously
taken out of her, and put on board the privateer.
And concludes with renewing the averments of the
piratical and tortious capture, and praying that resti-
tution of the property may be decreed to him, the
Spanish consul, to be held for the right owners or
owner thereof, who are subjects, or a subject of the
king of Spain.

Upon these pleadings, further proceedings were
had in the District Court, under which a decree was
pronounced of restitution of the vessel and cargo
to the libellant, for the benefit of the original Spa-
nish owners. This decree was affirmed, *pro forma*,
in the Circuit Court, and the cause was brought by
appeal to this Court.

*Feb. 3d.*     Mr. *Winder*, for the appellants, argued, that there
was nothing stated in the allegation of the Spanish

consul, or in the other pleadings in the cause, by which a prize court of this country could take jurisdiction of this capture. Nothing was alleged to show that it was made within our neutral territory, or in violation of our neutral rights by an armament fitted out, or augmented in our ports; the only two cases in which the tribunals of a neutral country can assume jurisdiction of captures made *jure belli*. The present capture was made *jure belli*, because made under a commission from the United Provinces of the Rio de la Plata. The government of the United States, recognizing the existence of a civil war between Spain and the United Provinces, but remaining neutral, the Courts of the United States must consider as legal, those acts of hostility which war authorizes, and which the new government may direct against the parent country.[a] Possession under the capture is *prima facie* evidence sufficient to maintain that possession, unless it is shown that the libellants have a better right. But that possession is admitted, and nothing is shown by the pleadings to authorize the Courts of this country to devest it from the captors. There is no infraction of the treaty with Spain pleaded, which can give our Courts jurisdiction to restore to the former Spanish owners. The 6th and 9th articles of the treaty of 1795 are the only articles which can have any bearing upon the case, and these only provide for restitution where the capture is made within our territorial limits, *or*, where it is made by pirates. But it is not pretended, that the present cap-

1819.

The Divina Pastora.

a The United States v. Palmer, 3 *Wheat.* 610. 634.

1819.

The Divina
Pastora.

ture was made within our territorial jurisdiction ; and the Court has already determined, that a capture under a commission from the revolted provinces is not a piratical capture.

Mr. *Webster* and Mr. *D. B. Ogden*, contra, contended, that the District Courts of the United States are Courts of the law of nations, and that a general allegation of a marine tort, in violation of the law of nations, is sufficient; *prima facie*, to give them jurisdiction, where the captured property is brought within our territory. As a general allegation of prize is sufficient,[a] so is a general allegation of an unlawful capture. It then becomes incumbent upon the captors to show that the capture was made under a commission from a sovereign power in amity with the United States. A neutral tribunal has a right to inquire, whether the commission was regularly issued by a competent authority, in order to see whether the capture was piratical, or in the exercise of the lawful rights of war.[b] The general rule, unquestionably, is, that the Courts of the captors's country have the exclusive cognizance of all seizures as prize : but to this rule there are exceptions, as ancient, and as firmly established as the rule itself. Among these is the case of a capture made by an armament fitted out or augmented within neutral territory. A capture thus made in violation of the neutral sovereignty

a The Fortuna, 1 *Dodson.* The Adeline, 9 *Cranch*, 244. 284.

b Talbot v. Janson, 3 *Dall.* 159. The Invincible, 1 *Wheat.* 258. 2 Sir *L. Jenkins*, 727.

deprives the Courts of the belligerent country of their exclusive jurisdiction, and confers it on the Courts of the neutral state, who will exercise it by making restitution to the injured party.[a] The acts of congress, and the Spanish treaty, prohibiting the equipment of armed vessels in our ports, and imposing the obligation to restore captures made by them, are merely accumulated upon the pre-existent law of nations, which equally prohibited the one, as an injury to friendly powers, and enjoined the other, as a correspondent duty.[b] But even if this were not the law

1819.

The Divina
Pastora.

a Talbot v. Janson, 3 *Dall.* 133. 164. The Alerta, 9 *Cranch,* 359. 364.

b *Vattel,* L. 3. c. 7. s. 104, 105. 2 *Rutherforth,* c. 9. s. 19. p. 553. *Martens on Privateers,* s. 13. p. 42. *Burlamaqui,* p. 4. c. 3. s. 20, 21. 23. 2 Sir L. Jenkins, 727, 728.

" So that upon this whole matter of fact, there do arise two questions : The one, whether the commission whereby this Ostender was taken, is a good commission ? The other, whether this capture was not a violence to that protection and safe guard, which your majesty's authority affords unto strangers, coming upon their lawful occasions towards any of your majesty's harbours or ports ?

" As to the commission, 'tis true, his majesty of Portugal is not obliged, in granting out commissions, to take his measures from the English, or any other foreign style ; yet the general law determines all commissions, (most especially, such as this is,) to be *stricti juris,* and not to be farther extended, either by inferences or deductions, than the express words do naturally import. So that, whatever the meaning of that clause be, viz., that *de Bills* may set out a man of war, and what other vessels shall be necessary for him, (as if he might have several vessels at sea, at one and the same time, and yet, himself and his commission can be but in one of them,) it cannot be said, that he hath liberty to substitute or depute another to act in

of nations, the treaty with Spain and the acts of congress make it the law of this Court. " Every treaty," says Sir W. Scott, " is a part of the private

his place, since there is no such power of deputation given him by his commission:  Much less can a copy or translation be authentick, when there is no clause providing to that effect in the original ; especially in this case, which is as little favourable as can be in the eye of the law.

. " The second question is, as I humbly conceive, best resolved out of a declaration, which your majesty's grandfather of blessed memory, published in the year 1604, in reference to these hostilities, in these words :

" Our pleasure is, that within our ports, havens, roads, creeks, or other places of our dominion, or so near to any of our said ports or havens, as may be reasonably construed to be within that title, limits, or precinct, there shall be no force, violence, or surprize, or offence, suffered to be done, either from man of war to man of war, or from man of war to merchant, &c., but that all of what nation soever, so long as they shall be within those our ports and places of jurisdiction, or where our officers may prohibit violence, shall be understood to be under our protection, and to be ordered by course of justice, &c.  And that our officers and subjects shall prohibit, as much as in them lies, all hovering of men of war, &c., so near the entry of any of our havens or coasts ; and that they shall receive and succour all merchants and others, that shall fall within the danger of any such as shall await our coasts, in so near places, to the hindrance of trade to and from our kingdoms."

" So that, considering this shallop set out of your majesty's port, where it hovered for prey ; since it was mann'd for the most part with your majesty's subjects, contrary to the meaning of the 4th and 6th articles of the treaty with Spain, made in the year 1630 ; since the surprisal was made in the night, not by force of arms, but by abusing your majesty's name and authority ; since the true commission was neither pretended showed, nor, indeed, on board at the time of the capture ; I

law of that state which enters into it."[a]  This principle of public law is expressly recognized by our municipal constitution, in which treaties entered into by the United States, are declared to be a part of the supreme law of the land.   The Spanish treaty and the acts of congress pronouncing the illegality of captures in violation of our neutrality, the duty to restore the captured property to the original owner follows as a corollary.   Supposing the allegations to be sufficiently pleaded, the proofs will fully authorize the Court in decreeing restitution to the original Spanish owners in this case.   But if the Court should be of opinion, that the pleadings are defective, it will not dismiss the injured party, but will permit him to assert his rights in a new allegation.[b]

Mr. Chief Justice MARSHALL delivered the opinion of the Court.   The decision at the last term, in the case of the United States v. Palmer,[c] establishes the principle that the government of the United States, having recognized the existence of a civil war between Spain and her colonies, but remaining neutral, the Courts of the Union are bound to consider as lawful, those acts which war authorizes, and which

1819.

The Divina
Pastora.

*Feb. 5th.*

am of opinion, that the capture was unduly made, and that the Ostender ought to have his ship and goods restored to him, and that the commander in the shallop, and the English on board, deserve to be punished.   All which I do with all humility submit to your majesty's royal wisdom."

L. JENKINS."

a  The Eenroom, 2 *Rob.* 8.

b The Adeline, 9 *Cranch*, 284.   The Edward, 1 *Wheat.* 261. 269.   The Samuel, *ib.* 13. note *g.*

c  3 *Wheat.* 610.

the new governments in South America may direct against their enemy. Unless the neutral rights of the United States, as ascertained by the law of nations, the acts of congress, and treaties with foreign powers, are violated by the cruizers sailing under commissions from those governments, captures by them are to be regarded by us as other captures, *jure belli*, are regarded; the legality of which cannot be determined in the courts of a neutral country. If, therefore, it appeared in this case, that the capture was made under a regular commission from the government established at Buenos Ayres, by a vessel which had not committed any violation of our neutrality, the captured property must be restored to the possession of the captors. But if, on the other hand, it was shown, that the capture was made in violation of our neutral rights and duties, restitution would be decreed to the original owners. But the pleadings in this case are too informal and defective to pronounce a final decree upon the merits. The proceedings in the admiralty must always contain at least a general allegation of such a nature as will apply to the case, as of prize, &c. The Court has always endeavoured to keep these proceedings within some kind of rule, though not requiring the same technical strictness as at common law. Here the pleadings present a case which may be consistent with the demand of the former owners for restitution, but which is tied up to such a state of facts as, if proved, will not authorize it; and will not admit the introduction of evidence varying from the facts alleged. The decree of the Circuit Court must, there-

fore, be reversed, and the cause remanded to that
Court, with directions to permit the pleadings to be
amended, and for farther proceedings.

## Cause remanded.[a]

a It is a principle which has been frequently laid down by
this Court, that it is the exclusive right of governments to ac-
knowledge new states arising in the revolutions of the world,
and until such recognition by our government, or by the go-
vernment of the empire to which such new state previously
belonged, courts of justice are bound to consider the ancient
state of things as remaining unchanged.  Rose v. Himely, 4
*Cranch,* 292.  Gelston v. Hoyt, *ante,* vol. III. p. 324.  The
distinction between the recognition of the independence of a
newly constituted government which separates itself from an
old established empire, and the recognition of the existence of
a civil war between such new government and the parent
country, is obvious.  In the latter case the very object of the
contest is what the former supposes to be decided.  But in the
mean time, all the belligerent rights which belong to anciently
established governments, except so far as they may be restrain-
ed by treaty stipulations, belong to both parties.  The obliga-
tions which neutrality imposes, are also to be fulfilled towards
each party.  What are those obligations, and how they may be
affected by the misconduct of the belligerents, has been fre-
quently made a subject of decision in this Court.

Thus where the commander of a French privateer, called
the *Citizen Genet,* having captured, as prize, on the high seas,
the sloop Betsey, sent the vessel into the port of Baltimore;
and upon her arrival there, the owners of the sloop and cargo
filed a libel in the District Court of Maryland, claiming restitu-
tion, because the *vessel* belonged to subjects of Sweden, a neutral
power, and the *cargo* was owned jointly by Swedes, and by
citizens of the United States, also neutral; it was held, that the
District Court of Maryland had jurisdiction competent to inquire,
and to decide, whether in such case, restitution ought to be

made to the .claimants, or either of them, in whole or in part ; that is, whether such restitution could be made consistently with the law of nations, and the treaties and laws of the United States.   Glass v. The Betsey, 3 *Dall.*. 6. 16.   This case has been sometimes criticised as involving a denial of the unques-' tionable principle of public law, that the judicial cognizance of prizes belongs, exclusively to the tribunals of the. captor's country, with the admitted exceptions of *a violation of neutral sovereignty* either in making the capture, or fitting out the armament with which it is made, within the neutral territory.   But, as is very justly observed by the Court in the case of the *Invincible*, the only point settled by the case of *Glass* v. *The Betsey* was, that the Courts of the neutral country have jurisdiction of captures made in violation of its neutrality, and the case was sent back with a view that the District Court should exercise jurisdiction, subject, however, to the law of nations on this matter, as the rule to govern its decision.   *Ante,* vol. I. p. 257.

So, also, it was held, in the same case, that no foreign power can, of right, institute or erect any court of judicature, of any kind, within the jurisdiction of the United States, but such only as may be warranted by, and be in pursuance of treaties: and that the admiralty jurisdiction which had been exercised in the United States by the consuls of France in the beginning of the war of 1793, not being so warranted, was illegal.   Glass v. The Betsey, 3-*Dall.* 6. 16.

The District Courts of the United States have no jurisdiction on a libel for damages for the capture of a vessel as prize by the commissioned cruizer of a belligerent power, although the captured vessel is alleged to belong to citizens of the United States, and although the capturing vessel and her commander be found and proceeded against within the jurisdiction of the Court; the captured vessel having been captured and carried *infra præsidia* of the captors.   The United States v. Peters, 3 *Dall.* 121.

The capture of a vessel from a belligerent power, by a citizen of the United States, under a commission from another belligerent power, (though the captor sets up an act of expatriation, not carried into effect by a departure from the United

States, with an intention to settle permanently in another country,) is an unlawful capture, and the Courts of the United States will decree restitution to the original owner. Talbot v. Janson, 3 *Dall.* 133. 164. A capture by a citizen of a neutral state, who sets up an act of expatriation to justify it, is unlawful, where the removal from his own country was by sailing, *cum dolo et culpa*, in the capacity of a cruizer against friendly powers. *Ib.* 153. *Quære,* Whether a citizen of the United States, expatriating himself according to the law of a particular State of the Union, of which he is also a citizen, can be considered as having lost the character of a citizen of the United States, so as to be authorized to capture under a foreign commission the property of powers in amity with the United States ? *Ib.* 153. A capture by a vessel, built, owned, and fitted out as a vessel of war, in a neutral country, is unlawful, and restitution of the property captured by such vessel, will be decreed by the Courts of the neutral country, if brought within its jurisdiction. *Ib.* 155. 167. Every illegal act committed on the high seas, does not amount to piracy. A capture, although not piratical, may be illegal, and of such a nature as to induce the Court to award restitution. *Ib.* 154. 160. A capture made by a lawfully commissioned cruizer through the medium and instrumentality of a neutral, who had no right to cruize, is unlawful; and the property captured will be restored by the neutral state, if brought within its jurisdiction. *Ib.* 155. 167. The exemption of belligerent captures on the high seas, from inquiry by neutral courts, belongs only to a belligerent vessel of war, *lawfully commissioned;* and if a vessel claims that exemption, it is the duty of the Court, upon application, to make inquiry, *whether she is the vessel she pretends to be. Ib.* 159. If, upon such inquiry, it appears, that the vessel pretending to be a lawful cruizer, is really not such, but uses a colourable commission for the purposes of plunder, she is to be considered by the law of nations, so far at least, as the title of property or right of possession is concerned, in the same light as having no commission at all. *Ib. Primâ facie,* all piracies and trespasses committed against the general law of na-

tions, are inquirable, and may be proceeded against, in any nation where no special exemption can be maintained either by the general law of nations, or by some treaty which forbids or restrains it. *Ib.* 160.

Where a vessel belonging to one belligerent was captured by another belligerent, and being abandoned on the high seas by the captors, to avoid the necessity of weakening their force by manning the prize, was found and taken possession of by citizens of the United States, and brought into a port of this country, and libelled in the District Court for salvage ; it was held, that the District Court had jurisdiction upon the subject of salvage, and, consequently, a power of determining to whom the residue of the property, after payment of salvage, ought to be delivered. M'Donough *et al.* v. The Mary Ford, 3 *Dall.* 188. 198. In this case the captors acquired, immediately on the capture, such a right as no neutral nation could justly impugn or destroy ; and it could not be said by the Court, that the abandonment of the captured vessel revived the interest of the original proprietors. One third of the value of the property was, therefore, decreed to the neutral salvors, and the residue restored to the captors. *Ib.* This case has been sometimes supposed to involve the inconsistency of a neutral tribunal assuming jurisdiction of the question of prize, or no prize, as an incident to that of salvage. But an attentive examination of the case will show that this is a mistaken supposition. The Court do not enter into the question of prize between the belligerents, but decree the residue to the late possessor : thus, making the fact of possession as between the belligerent parties, the criterion of right. Those points which could be disposed of without any reference to the legal exercise of the rights of war, the Court proceed to decide ; but those which necessarily involve the question of prize, or no prize, they remit to another tribunal. L'Invincible, *ante, vol.* I. *p.* 259.

Where the vessel which captured the prize in question, had been built in the United States, with the express view of being employed as a privateer, in case the then existing differences between Great Britain and the United States should terminate

in war ; some of her equipments were calculated for war, though frequently used by merchant ships ; she was subsequently sold to a subject of one of the belligerent powers, and by him carried to a port of his own country, where she was completely armed, equipped, and furnished with a commission, and afterwards sailed on a cruize, and captured the prize : It was held, that this was not an illegal outfit in the United States, so as to invalidate the capture, and give their Courts jurisdiction to restore to the original owner the captured property.  Moodie v. The Alfred, 3 *Dall.* 307.  A mere replacement of the force of a privateer in a neutral port is not such an outfit and equipment as will invalidate the captures made by her, and give the Courts of the neutral country jurisdiction to restore the captured property to the original owner.  Moodie v. The Phœbe Anne, 3 *Dall.* 319.

A vessel and cargo belonging to citizens of the United States was captured as a prize by a cruizer belonging to one of the belligerent powers on the high seas, and run on shore within the territory of the United States, by the prize master, to avoid recapture by the other belligerent, and *abandoned by the prize crew ;* the vessel and cargo were then attached by the original owner, and an agreement was entered into by the parties, that they should be sold, and the proceeds paid into the District Court, to abide the issue of a suit commenced by the owner against the captors for damages : *Held,* that they were responsible for the full value of the property injured or destroyed, and that whatever might originally have been the irregularity in attaching the captured vessel and cargo, *it was obviated by the consent of the captors that the prize should be sold, and that the proceeds of the sale should abide the issue of the suit.*  Del Col v. Arnold, 3 *Dall.* 233.  The consistency of the Court in this case cannot be vindicated with the same facility as in that of the Mary Ford.  " We are, however, induced to believe, from several circumstances, that we have transmitted to us but an imperfect sketch of the decision in that case.  The brevity with which a case is reported, which we are informed, had been argued successively at two terms, by men of the first legal talents, necessarily suggests this opinion ; and when we refer

1819.

The Divina
Pastora

to the case of the Cassius, (The United States v. Peters,) de-
cided but the term preceding, and observe the correctness
with which the law applicable to this case, in principle, is laid
down in the recitals to the prohibition, we are confirmed in
that opinion. But the case itself (that of Del Col v. Arnold)
furnishes additional confirmation. There is one view of it in
which it is reconcilable to every legal principle. It appears,
that when pursued by the Terpsichore, the Grand Sachem was
wholly abandoned by the prize crew, and left in possession of
one of the original American crew, and a passenger ; that, in
their possession, she was driven within our territorial limits,
and was actually on shore when the prize crew resumed their
possession, and plundered and scuttled her. Supposing this to
have been a case of total derelict, (an opinion, which, if incor-
rect, was only so on a point of fact, and one in support of which
much might have been said, as the prize crew had no proprie-
tary interest, but only a right founded on the fact of possession,)
it would follow, that the subsequent resumption of possession
was tortious, and subjected the parties to damages. On the
propriety of the seizure of the Industry, to satisfy those da-
mages, the Court give no opinion, but place the application of
the proceeds of the sale of this vessel, on the ground of con-
sent ; a principle, on the correctness of the application of
which to that case, the report affords no ground to decide."
The Invincible, ante, vol. I. p. 259. 260.

A public vessel of war belonging to a foreign sovereign at
peace with the United States, coming into our ports, and de-
meaning herself in a friendly manner, is exempt from the ju-
risdiction of the Courts of the country. The Exchange, 7
Cranch, 116. If there be no prohibition, the ports of a friendly
nation are considered as open to the public ships of all other
nations with whom it is at peace, and they enter such ports,
and remain in them under the protection of the government of
the place. Ib. 141. Whether the public ships of war enter
the ports of another friendly nation, under the license implied
by the absence of any prohibition, or under an express stipula-
tion by treaty, they are equally exempt from the local juris-
diction. Ib. 141. Where the private vessels of one nation

enter the ports of another, under a general implied permission only, they are not exempt from the local jurisdiction. *Ib.* 143. The sovereign of the place is capable of destroying the implication, under which national ships of war, entering the ports of a friendly power, open for their reception, are considered as exempted by the consent of that power from its jurisdiction. He may claim and exercise jurisdiction over them, either by employing force, or by subjecting such vessels to the ordinary tribunals. *Ib.* 146. But until such power be expressly exerted, those general provisions which are descriptive of the ordinary jurisdiction of the judicial tribunals, and give an individual, whose property has been wrested from him, a right to claim that property in the Courts of the country where it is found, ought not to be so construed as to give them jurisdiction in a case, in which the sovereign power has impliedly consented to waive its jurisdiction. *Ib.* 146. Upon these grounds it was determined, in this case, that a public vessel of war, belonging to the emperor Napoleon, which had before been the property of a citizen of the United States, and, as alleged, wrongfully seized by the French, coming into our ports, and demeaning herself peaceably, could not be reclaimed by the former owner in the tribunals of this country. *Ib.*

The general rule as to the prize jurisdiction is, that the trial of captures made on the high seas, *jure belli*, by a duly commissioned vessel of war, whether from an enemy or a neutral, belongs exclusively to the Courts of that nation to which the captor belongs. The Alerta, 9 *Cranch*, 359. 364. But to this rule there are exceptions as firmly established as the rule itself. If the capture be made within the territorial limits of a neutral country, into which the prize is brought, or by a privateer which has been illegally equipped in such neutral country, the prize Courts of such neutral country not only possess the power, but it is their duty to restore the property so illegally captured to the owner. *Ib.* 364. Talbot v. Janson, 3 *Dall.* 133. *Ib.* 288. *note.* A neutral nation may, if so disposed, without a breach of its neutral character, grant permission to both belligerents to equip their vessels of war within its territory. But without such permission, the subjects of the belligerent powers have no right to equip vessels, or to augment their force, either

with arms, or with men, within the territory of the neutral nation. The Alerta, 9 *Cranch*, 365. All captures made by means of such equipments of vessels, or augmentation of their force within the neutral territory, are illegal in respect to the neutral nation, and it is competent for its courts to punish the offenders, and in case the prizes taken by them are brought *infra præsidia*, to order them to be restored. *Ib*. Even if there were any doubt as to the rule of the law of nations on the subject, the illegality of equipping a foreign vessel of war within the territory of the United States, is declared by the act of June 5th, 1794, c. 226. (1) and the power and duty of the proper court of the United States, to restore the prizes made in violation of that act, is clearly recognized. *Ib*. To constitute an illegal equipment or augmentation of the force of a vessel within the territory of the United States, it is immaterial whether the persons enlisted are native citizens, or foreigners domiciled within the United States. Neither the law of nations, nor the act of congress, recognizes any distinction in this respect, except as to subjects of the foreign state in whose service they are so enlisted, being transiently within the United States. *Ib*. 366.

During the late war between the United States and Great Britain, a French privateer, called the Invincible, and duly commissioned, was captured by a British cruizer, afterwards recaptured by a private armed vessel of the United States ; again captured by a squadron of British frigates ; again recaptured by another United States privateer, and brought into a port of the United States for adjudication. Restitution on payment of salvage was claimed by the French consul on behalf of the owners of the Invincible. A claim was also interposed by citizens of the United States, who alleged, that their property had been unlawfully taken by the Invincible, before her first capture, on the high seas, and prayed an indemnification from the proceeds. Restitution to the original French owner was decreed by the Circuit Court, which decree was affirmed in this Court ; and it was determined that the tribunals of this country have no jurisdiction to redress any supposed torts committed on the high

(1) This act was made perpetual by that of April 24th, 1800, c. 189. which was repealed, and all laws respecting our neutral relations were incorporated into one, by the act of the 20th of April, 1818, c. 93.

seas upon the property of our citizens, by a cruizer regularly commissioned by a foreign and friendly power, except where such cruizer has been fitted out in violation of our neutrality. *L'Invincible, ante, vol.* 1. p. 238. S. C. 2 *Gallis.* 29.

*Vide infra,* the cases of the *Estrella,* and the *Neustra Senora de la Caradid,* in which the same principles which are collected in this note were applied to captures of Spanish property by Venezuelean and Carthagenian privateers, and the property was restored to the original owners, or to the captors, according as the capture had, or had not been made in violation of our neutrality.

For the different public acts by which the government of the United States has recognized the existence of a civil war between Spain and her American colonies, see the *Appendix, note* II.