HALL, Circuit Judge,
concurring:
As reflected in the per curiam opinion, I agree with Judge Katzmann with respect to the ultimate disposition of this appeal. The district court erred when it ruled that it lacked jurisdiction under the ATCA to determine plaintiffs’ claims based on defendants’ accessorial liability. In ruling that it lacked subject matter jurisdiction under the ATCA, the district court required that “aiding and abetting international law violations [be] itself an international law violation that is universally accepted as a legal obligation.” In re S. African Apartheid Litig., 346 F.Supp.2d 538, 549 (S.D.N.Y.2004). In other words, the district court assumed that a federal court must look to international law to divine not only the applicable primary violation of international law cognizable under the ATCA, but also the standard for aiding and abetting liability. The district court went on to conclude that aiding and abetting liability did not exist as a matter of customary international law and thus that federal subject matter jurisdiction did not lie. This conclusion was error. As Sosa makes clear, a federal court must turn to international law to divine standards of primary liability under the ATCA. To derive a standard of accessorial liability, however, a federal court should consult the federal common law.
I
A
We begin with the text. In its entirety, the ATCA provides:
The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States.
28 U.S.C. § 1350. The First Congress enacted the statute as part of the Judiciary Act of 1789. Over the course of the last 200-odd years, the text of the statute has changed only slightly, but “little is known of the framers’ intentions in adopting it— the legislative history of the Judiciary Act does not refer to section 1350.” Presbyterian Church of Sudan v. Talisman Energy, Inc., 244 F.Supp.2d 289, 304 (S.D.N.Y.2003). New parties invoked the ATCA until our decision in Filartiga v. Penar-Irala, 630 F.2d 876 (2d Cir.1980), which heralded the modern era of ATCA litigation. But from the very beginning, the ATCA’s straightforward text belied complex and controversial problems of exegesis and praxis. Struggling with these prob *285 lems in the wave of litigation that followed Filartiga, we observed that “neither Congress nor the Supreme Court ha[d] definitively resolved the complex and controversial questions regarding the meaning and scope of the ATCA.” Flores v. S. Peru Copper Corp., 414 F.3d 233, 247 (2d Cir. 2003).
One year later, in an attempt to clarify the problems posed by the ATCA, the Supreme Court issued Sosa v. Alvarez-Machain, 542 U.S. 692, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004). Principally, Sosa resolved that the ATCA was not “a jurisdictional convenience to be placed on the shelf for use by a future Congress ... that might, someday, authorize the creation of causes of action.” Id. at 719, 124 S.Ct. 2739. Instead, the ATCA recognizes “claim[s] based on the present-day law of nations” so long as they “rest on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigms.” Id. at 725, 124 S.Ct. 2739.
B
In their complaints, the plaintiffs make claims that rest on such norms “defined with a specificity comparable to the features of the 18th-century paradigms.” The allegations include genocide, torture, cruel and degrading treatment, systematic racial discrimination, forced removals, and various other avowed crimes against humanity. In essence, the plaintiffs assert that apartheid itself is a crime against humanity,[1] on a par with genocide[2] and slavery, and that the depredations of the apartheid system (such as torture, sexual assault, extrajudicial killing, and forced labor) were perpetrated in the course of genocide and crimes against humanity. In their brief and at oral argument, the corporations did not contest that such allegations reflected violations of customary international law.[3] Though their complaints *286 are not models of precision, the plaintiffs, if given the opportunity to replead, likely would allege primary violations of international law cognizable under the ATCA.
C
In addition to its delineation of the standard by which federal courts derive primary violations of international law, the Sosa opinion also contains numerous dicta. In his concurring opinion, Judge Katz-mann thoroughly summarizes these dicta. It remains inescapable, however, that Sosa at best lends Delphian guidance on the question of whether the federal common law or customary international law represents the proper source from which to derive a standard of aiding and abetting liability under the ATCA. Lacking the benefit of clear guidance, I presume a federal court should resort to its traditional source, the federal common law, when deriving the standard. Because I find that federal common law provides a standard by which to assess aiding and abetting liability, I do not address the alternative argument that such a standard may be derived from international law.[4]
It is a “hornbook principle that international law does not specify the means of its domestic enforcement.” Brief for the International Law Scholars as Amici Curiae at 5-6; see also Brief for the United States of America as Amicus Curiae at 5 (“[Although the substantive norm to be applied is drawn from international law or treaty, any cause of action recognized by a federal court is one devised as a matter of federal common law.”). As Judge Edwards has explained, “the law of nations never has been perceived to create or define the civil actions to be made available by each member of the community of nations.” Tel-Oren v. Libyan Arab Republic, 726 F.2d 774, 778 (D.C.Cir.1984) (Edwards, J., concurring); see also Kadic v. Karadzic, 70 F.3d 232, 246 (2d Cir.1995) (“The law of nations generally does not create private causes of action to remedy its violations, but leaves to each nation the task of defining the remedies that are available for international law violations.”); Xuncax v. Gramajo, 886 F.Supp. 162, 180 (D.Mass.1995) (“While it is demonstrably possible for nations to reach some consensus on a binding set of principles, it is both unnecessary and implausible to suppose that, with their multiplicity of legal systems, these diverse nations should also be expected or required to reach consensus on the types of actions that should be made available in their respective courts to implement those principles.”); Restatement (Third) of Foreign Relations Law § 703 cmt. c (“In general, individuals do not have direct international remedies against a state violating their human rights except where such remedies are provided by international agreement. Whether they have a remedy under the law of a state depends on that state’s law.” (internal citation omitted)); Beth Stephens, Sosa v. Alvarez-Machain: “The Door Is Still Ajar” for Human Rights Litigation in U.S. Courts, 70 Brook. L.Rev. 533, 558 (2004) (“Sosa does not require that every ancillary rule applied in an AT[CA] case meet the level of international consensus required for the definition *287 of the underlying violation. As in any case in which the federal courts exercise discretion to recognize federal common law, the courts will fashion rules to fill gaps, borrowing from the most analogous body of law”).
Numerous international law scholars have described this principle. See L. Hen-kin, Foreign Affairs and the Constitution 224 (1972); Oppenheim, 1 International Law 44-46 (8th ed.1955); L. Henkin, R. Pugh, O. Schachter & H. Smit, International Law 116 (1980); 4 Blackstone’s Commentaries 72 (Welsby ed., 1854) (noting that the law of nations recognized certain universal offenses but that accessorial liability is made available “by statute”). As amicus International Law Scholars persuasively argue, these “means of domestic enforcement” encompass at least some theories of accessorial liability, including aiding and abetting. Brief for International Law Scholars as Amici Curiae at 6. I believe our Court should stand by this principle. Moreover, when international law and domestic law speak on the same doctrine, domestic courts should choose the latter. Oppenheim, supra, at 44-46. This, too, is a principle our Court should respect. Here, customary international law and the federal common law both include standards of aiding and abetting. In a situation such as this, I opt for the standard articulated by the federal common law.
Supreme Court precedent commands the same result. As Judge Reinhardt noted when concurring in Doe I v. Unocal Corp., 395 F.3d 932 (9th Cir.2002), the ATCA is silent “as to what body of law applies to ancillary issues that may arise, such as whether a third party may be held liable in tort” for a violation of international norms. Id. at 965 (Reinhardt, J., concurring). Typically, federal courts look to the federal common law to fill such an interstice. Id. at 966 (citing United States v. Kimbell Foods, 440 U.S. 715, 727, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979)); see also Tex. Indus., Inc. v. Radcliff Materials, Inc., 451 U.S. 630, 641, 101 S.Ct. 2061, 68 L.Ed.2d 500 (1981) (stating that courts should apply the federal common law “in such narrow areas as those concerned with the rights and obligations of the United States, interstate and international disputes implicating the conflicting rights of States or our relations with foreign nations”). Until the Supreme Court provides us more explicit guidance regarding acces-sorial liability than it has to date, I remain convinced that our federal common law embodies a clearly extant standard of aiding and abetting liability. See Unocal, 395 F.3d at 967. It is to this standard that federal courts should resort and to which I now turn.
The Supreme Court has described Halberstam v. Welch, 705 F.2d 472 (D.C.Cir.1983), as “a comprehensive opinion on the subject [of aiding and abetting].” Cent. Bank, N.A. v. First Interstate Bank, N.A., 511 U.S. 164, 181, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994). Halberstam relied heavily upon the Restatement (Second) of Torts to set the parameters of aiding and abetting liability. Section 876(b) of the Restatement provides: “For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he ... (b) knows that the other’s conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself.” Based on the Restatement, Halberstam held that aiding and abetting included three elements:
(1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the *288 time that he provides the assistance; [and] (3) the defendant must knowingly and substantially assist the principal violation.
Halberstam, 705 F.2d at 477. The Halberstam Court then adopted and applied the factors enumerated in § 876 to assess whether the defendant’s encouragement or assistance was sufficiently substantial to support liability. “The Restatement suggests five factors in making this determination: ‘the nature of the act encouraged, the amount of assistance given by the defendant, his presence or absence at the time of the tort, his relation to the other tortfeasor and his state of mind.’ ” Id. at 478 (quoting Restatement (Second) of Torts § 876 cmt. d) (alteration omitted). In the almost quarter-century since Hal-berstam was decided, many state courts and Circuit Courts, including the Second Circuit, have adopted the Restatement’s aiding and abetting standard. Following the lead of the Halberstam Court, I believe that § 876 provides the proper standard under which to assess whether a particular defendant may be held liable for aiding and abetting a primary violation of international law.[5] I also agree with the Halberstam Court that “a person who assists a tortious act may be liable for other reasonably foreseeable acts done in connection with it.” Id. at 484.
Under a proper application of § 876 to ATCA civil aiding and abetting claims, liability should be found only where there is evidence that a defendant furthered the violation of a clearly established international law norm in one of three ways: (1) by knowingly and substantially assisting a principal tortfeasor, such as a foreign government or its proxy, to commit an act that violates a clearly established international law norm; (2) by encouraging, advising, contracting with, or otherwise soli *289 citing a principal tortfeasor to commit an act while having actual or constructive knowledge that the principal tortfeasor will violate a clearly established customary international law norm in the process of completing that act; or (3) by facilitating the commission of human rights violations by providing the principal tortfeasor with the tools, instrumentalities, or services to commit those violations with actual or constructive knowledge that those tools, in-strumentalities, or services will be (or only could be) used in connection with that purpose.
All members of this panel understand that corporations must transact business in a less than perfect world. I do not understand defendants to argue, however, that business imperatives require a license to assist in violations of international law. Rather, I understand defendants to express the concern that the recognition of ATCA aiding and abetting liability could expose corporations to liability for merely doing business in countries with repressive regimes or for participating in activities that, with twenty-twenty hindsight, can be said to have been indirectly linked to human rights abuses. I share Judge Katzmann’s understanding, however, that private parties and corporate actors are subject to liability under the ATCA. I therefore concur in Part II.D.2 of Judge Katzmann’s opinion to the extent that it recognizes the general legal principle that aiding and abetting liability obtains even where the culpable actor is incapable of violating the relevant legal norm as a principal, and I concur' in Part II.D.3 of his opinion in full. Defendants raise important concerns about such liability, but those concerns do not counsel in favor of the per se rejection of corporate liability, private party liability, and aiding and abetting liability under the ATCA. Instead, they require the narrow and careful extension of such liability to cases in which a defendant played a knowing and substantial role in the violation of a clearly recognized international law norm. Furthermore, the collateral consequences predicted by defendants and the dissent remain relevant considerations when making these judgments, as the common law nature of the inquiry allows for a limited but meaningful consideration of the practical consequences of extending ATCA liability in the context of each particular case.
Because I intend aiding and abetting liability to attach only in this limited way, I think it helpful to provide examples illustrating the three ways in which I believe a defendant may incur liability for aiding and abetting violations of customary international law. The first type of aiding and abetting liability is designed to capture the case of a principal tortfeasor who seeks assistance from a defendant to commit an act that violates international law norms, such as the extrajudicial killing of an opposition political figure. The second is designed to cover circumstances where the alleged aider and abettor is accused of having purchased security services with the knowledge that the security forces would, or were likely to, commit international law violations in fulfilling their mandate. The allegations raised in the cases of Unocal, 395 F.3d 932, and Wiwa v. Royal Dutch Petroleum Co., No. 96-Civ-8386, 2002 WL 319887 (S.D.N.Y. Feb.28, 2002), would be reached by this prong. In Unocal, the alleged aider and abettor corporation was accused of having purchased security services from a military government to further develop its oil operations, with the knowledge that the security forces would likely commit international law violations in fulfilling this mandate. 395 F.3d at 938-42. In Wiwa, the plaintiffs alleged that the defendants directed and aided government security forces in violating plaintiffs’ rights by pro *290 viding logistical support, transportation, and weapons to government security forces to ensure that the corporation’s business activities could proceed “as usual.” Wiwa, No. 96-Civ-8386, 2002 WL 319887, at *2.
The Zyklon B Case provides a clear example of when liability would attach in the third circumstance, when a defendant provides “the tools, instrumentalities, or services to commit [human rights] violations with actual ... knowledge that those tools, instrumentalities or services will be (or only could be) used in connection with that purpose.” See Trial of Bruno Tesch and Two Others (The Zyklon B Case), 1 Law Reports of Trials of War Criminals 93 (1947) (British Military Ct., Hamburg, Mar. 1-8, 1946). In that case, Bruno Tesch was the sole owner of a firm that distributed Zyklon B, a highly dangerous poison gas, to Auschwitz and other concentration camps from 1941 to 1945. Zyklon B previously had been used as a disinfectant in public buildings. The evidence showed that Tesch himself proposed using the gas to exterminate human beings, undertook to train the S.S. in this “new method of killing,” and was aware that, by June 1942, the gas was being used for such a purpose. Id. at 95. The Prosecutor successfully argued that “knowingly to supply a commodity to a branch of the State which was using that commodity for the mass extermination of Allied civilian nationals was a war crime, and that the people who did it were war criminals for putting the means to commit the crime into the hands of those who actually carried it out.” Id. at 94.
These examples are illustrative rather than exhaustive, and I offer them in an effort to provide greater substantive content for a doctrinal framework that, like most common law rules, is “vague” and abstract in its articulation of legal obligations and culpable conduct. Opinion of Judge Korman at 330 (criticizing Restatement aiding-and-abetting standard as “vague and inappropriate in the present context”). Standards such as “substantial assistance” and “actual or constructive knowledge” are hardly “newly minted,” however, and judicial decisions interpreting the meaning of these standards in the context of individual cases will provide guidance to courts considering accessorial liability under the ATCA. See, e.g., Henry v. Lehman Commercial Paper, Inc., 471 F.3d 977, 993 (9th Cir.2006) (applying California law on the “knowledge” requirement of § 876); Aetna Cas. & Sur. Co. v. Leahey Constr. Co., 219 F.3d 519, 535-37 (6th Cir.2000) (applying knowledge and substantial assistance requirements of § 876); In re Temporomandibular Joint (TMJ) Implants Prods. Liab. Litig., 113 F.3d 1484, 1496 (8th Cir.1997) (addressing “substantial assistance” requirement in context of products liability litigation); Rochez Bros., Inc. v. Rhoades, 527 F.2d 880, 886 (3d Cir.1975) (“It has been held that liability for aiding and abetting may be found on less than actual knowledge of the illegal activity. How much or how little knowledge would seem to vary with the facts of each case.” (citation omitted)). Common law decisionmaking proceeds through the incremental, analogical application of broadly-stated principles, and it is therefore not amenable to the formulation of finely detailed rules in the manner of a regulatory code. Contrary to the dissent’s suggestions, however, the contextual nature and factual sensitivity of common law judicial rulemaking takes account of the “practical problems” that can result from ill-designed legal rules, and the flexibility of the common law process allows those problems to be addressed and avoided as they arise.
In the case at bar, plaintiffs have alleged, albeit in insufficiently specific terms, *291 that the defendant corporations (a) knowingly and substantially assisted a principal tortfeasor to commit acts that violate clearly established international law norms, and (b) facilitated the commission of international law violations by providing the principal tortfeasors with the tools, instrumentalities, or services to commit those violations with actual or constructive knowledge that those tools, instrumentalities, or services would be (or only could be) used in connection with that purpose. Such allegations, if proven, clearly satisfy the standard for asserting ATCA liability under an aiding and abetting theory.
As to the arguments raised by the Ntsebeza and Digwamaje plaintiffs regarding direct liability claims and the district court’s treatment of them, I concur with and join in Part II.E of Judge Katzmann’s concurring opinion.
II
This case has confronted our panel with a number of difficult and unsettled questions in a controversial area of the law. As have other courts, see, e.g., Tel-Oren, 726 F.2d at 775, we have struggled with these issues in an effort to find some ground on which a majority of our panel could fully agree. Unfortunately, despite tireless debate, we remain diverse in our perspectives. Though our already lengthy opinions scarcely demand lengthening, I wish to articulate in a bit more detail one objection to the dissent covered in part in footnote 14 of the per curiam opinion.
The dissent contends that the district court lacked subject matter jurisdiction as a result of certain justiciability doctrines, such as case specific deference, the political question doctrine, and international comity. Respectfully, this contention is in error. In Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), the Supreme Court distinguished between the two. The existence, vel non, of subject matter jurisdiction is simply a question (with few exceptions not relevant here) of whether a claim arises under federal law. Id. at 198, 82 S.Ct. 691. If subject matter jurisdiction exists, a court may then — and only then — inquire as to the applicability of any of the various justiciability doctrines:
The District Court was uncertain whether our cases withholding federal judicial relief rested upon a lack of federal jurisdiction or upon ... “[ jjusticiability.” The distinction between the two grounds is significant. In the instance of nonjus-ticiability, consideration of the cause is not wholly and immediately foreclosed; rather, the Court’s inquiry necessarily proceeds to the point of deciding whether the duty asserted can be judicially identified and its breach judicially determined, and whether protection for the right asserted can be judicially molded. In the instance of lack of jurisdiction the cause either does not “arise under” the Federal Constitution, laws or treaties (or fall within one of the other enumerated categories of Art. Ill, § 2), or is not a “case or controversy” within the meaning of that section; or the cause is not one described by any jurisdictional statute.
Id. (citations omitted). As this quote makes clear, the dissent errs in conflating the anterior question of the existence of subject matter jurisdiction with the posterior question of justiciability. Cf. Sinochem Int’l Co. v. Malay. Int’l Shipping Corp., — U.S.-, 127 S.Ct. 1184, 1191, 167 L.Ed.2d 15 (2007) (“[A] federal court generally may not rule on the merits of a case without first determining that it has jurisdiction over the category of claim in suit_”). The dissent’s error is not a minor one. By conflating these questions, the dissent provides itself the opportunity *292 to discuss case specific deference, the political question doctrine, and international comity. This discussion, in turn, contains a number of missteps, at least two of which merit our attention in this context. The dissent suggests a district court — or even an appellate court, sitting in review — must dismiss a case when the executive branch, through a State Department Statement of Interest or other document, deems a case to be a political “irritant.” This is not so. Mere executive fiat cannot control the disposition of a case before a federal court. Our principle of separation of powers not only counsels the judiciary to conduct an independent inquiry — -it requires us to do so. Regardless of what else Sosa holds, it did not doubt that ATCA suits are law suits constitutionally entrusted to the judiciary. Cf. Whiteman v. Dorotheum GmbH & Co. KG, 431 F.3d 57, 69 (2d Cir.2005) (“[N]ot every case touching foreign relations is nonjusticiable and judges should not reflexively invoke these doctrines to avoid difficult and somewhat sensitive decisions in the context of human rights.” (quoting Kadic, 70 F.3d at 249 (internal quotation marks omitted))). Thus a district court must weigh the Statement of Interest, as well as other relevant facts, in applying the Baker v. Carr factors and exercising its own discretion before deciding whether to dismiss a complaint.
Ill
For the foregoing reasons, I join in the per curiam opinion.

. The Charter of the International Military Tribunal (Nuremberg Tribunal) describes crimes against humanity as:
murder, extermination, enslavement, deportation, and other inhumane acts committed against any civilian population, before or during the war, or persecutions on political, racial, or religious grounds in execution of or in connection with any crime within the jurisdiction of the Tribunal, whether or not in violation of domestic law of the country where perpetrated.
Charter of the International Military Tribunal, art. 6(c), in Agreement for the Prosecution and Punishment of the Major War Criminals of the European Axis, Aug. 8, 1945, E.A.S. No. 472.

. The Genocide Convention defines genocide as:
any of the following acts committed with intent to destroy, in whole or in part, a national, ethnical, racial or religious group, as such:
(a) Killing members of the group;
(b) Causing serious bodily or mental harm to members of the group;
(c)Deliberately inflicting on the group conditions of life calculated to bring about its physical destruction in whole or in part.
Convention on the Prevention and Punishment of the Crime of Genocide, art. 2, Jan. 12, 1951, 78 U.N.T.S. 277.
Notably, the Apartheid Convention echoes the definition of genocide, in that it applies to “murder of members of a racial group or groups,” "the infliction upon the members of a racial group or groups of serious bodily or mental harm,” and the “[d]eliberate imposition on a racial group or groups of living conditions calculated to cause its or their physical destruction in whole or in part.” Convention on Apartheid, art. 2, Nov. 30, 1973, 1015 U.N.T.S. 243.

.At oral argument, counsel for the corporations added that he did not accept the premise that the plaintiffs had actually pled those allegations, as the complaints did not allege that particular plaintiffs suffered particular injuries at the hands of specific South African officials whom the corporations aided and abetted in a specific way at a specific time and place. As reflected in the per curiam *286 opinion, plaintiffs may have an opportunity to replead these violations with greater specificity on remand.

. I note that Judge Katzmann, in his concurring opinion, declines to address whether federal common law provides a standard by which to determine aiding and abetting liability in this case. Opinion of Judge Katzmann at 331 n. 13. It is thus left to a future panel of this Court to determine whether international or domestic federal common law is the exclusive source from which to derive the applicable standard.

. I agree with Judge Katzmann that Central Bank, 511 U.S. at 164, 114 S.Ct. 1439, poses no bar to finding aiding and abetting liability under the ATCA, albeit for a different reason. In Central Bank, the Supreme Court held that the Securities Acts of 1933 and 1934 did not encompass aiding and abetting liability. 511 U.S. at 171, 114 S.Ct. 1439. Noting that the Acts provided for some forms of "indirect” liability, the Supreme Court reasoned that "Congress knew how to impose aiding and abetting liability when it chose to do so.” Id. at 176, 114 S.Ct. 1439. This same reasoning cannot apply to the ATCA, whose textual brevity and dearth of legislative history leave us with inconclusive evidence of Congress's intent to include or exclude aiding and abetting liability. It would appear, however, that the Founding Generation nevertheless understood the ATCA encompassed aiding and abetting liability. For example, in Attorney General Bradford’s 1795 opinion, Breach of Neutrality, 1 Op. Att'y Gen. 57, 59 (1795), he opined that the ATCA allowed civil suits for damages for those who had "taken part" in violating international law. Sosa, 542 U.S. at 721, 124 S.Ct. 2739. In fact, Bradford’s opinion specifically covered those American citizens who "voluntarily joined, conducted, aided and abetied ” the French fleet in their attack on a British settlement. Breach of Neutrality, 1 Op. Att'y Gen. at 58 (emphasis added). Attorney General Bradford furthermore referred to an April 1793 Proclamation issued by George Washington which declared that "all those who should render themselves liable to punishment under the laws of nations, by committing, aiding or abetting hostilities” against the merchants of foreign nations at peace with the United States would not receive the protection of the United States. Id. at 59. Cases from that era, moreover, indicate that secondary liability was recognized as an established part of the federal common law. See Talbot v. Jansen, 3 U.S. (3 Dall.) 133, 1 L.Ed. 540 (1795) (holding a defendant liable for aiding the unlawful capture of a neutral ship and ordering restitution); Henfield's Case, 11 F. Cas. 1099, 1103 (C.C.D.Pa.1793) (Chief Justice John Jay) (charging a grand jury that United States citizens may be held liable under the laws of the United States for "committing, aiding or abetting hostilities” in violation of the law of nations); see also Congress’s Act of April 30, 1790, 1 Slat. 114 (1790) (deeming "an accessary [sic] to ... piracies” anyone who "knowingly and willingly aid[ed]” piracy).